Larry E. GUTHRIE, Appellant,

v.

Darby SUITER, Individually and as Independent Executor of the Estate of Genevieve Ruth Wood, Deceased, as Trustee of the Angela Dawn Trent Trust, as Trustee of the Justin Wayne Suiter Trust, and as Trustee of the Nicholas Ryan Trent Trust, Appellee.

No. 01–95–00916–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 31, 1996.

Michael Hirsch, Douglas A. Lacey, Houston, for appellant.

Rayford J. Black, David C. Wallace, Sharon B. Gardner, Houston, for appellee.

Before HEDGES, COHEN and TAFT, JJ.

## OPINION

HEDGES, Justice.

In this will contest case, the trial court granted a summary judgment in favor of the executor of the will, Darby Suiter, and against the contestant, Larry E. Guthrie. Guthrie appeals. We reverse and remand.

## BACKGROUND

The testatrix, Genevieve Ruth Wood, was born Genevieve Suiter in 1920. She was the oldest of four children. Her brothers were Darby Suiter, Kenneth Suiter, and Flemming Suiter. Flemming Suiter died long before his sister. In 1940, the testatrix married Kenneth Guthrie. Together they had two children, Daryl Guthrie and Larry Guthrie. Daryl died before the testatrix. Larry Guthrie is the contestant to the testatrix's will.

Shortly after the contestant was born, the testatrix was committed to a mental hospital in Ohio. After spending about five years in the mental hospital, the testatrix underwent a frontal lobotomy and was released from the mental hospital.

The testatrix and Kenneth Guthrie were divorced in 1955. Shortly thereafter, the testatrix moved to Houston where her brother, Darby Suiter, the executor, lived. In 1972, the testatrix married Fred Schuetze. They remained married until Mr. Schuetze's death in 1985. Two years later, the testatrix married Campbell Wood, to whom she was married at the time of her own death on August 10, 1993.

On February 14, 1994, Darby Suiter filed an application to probate his sister's will, which was dated April 10, 1992. The will was admitted to probate and Darby Suiter was appointed independent executor. As of the date of her death, the testatrix's estate was worth $378,000.

The will provided the following dispositions:

I [Genevieve Suiter Wood] hereby give, devise and bequeath unto Darby Suiter and Kenneth B. Suiter as joint trustees all the rest and residue of my estate, including cash, cd's, stocks, bonds, real estate and all personalty to be held in trust for the use and benefit of my son, W. Daryl Guthrie, during his lifetime. Upon the death of Wm. Daryl Guthrie, my entire estate, realty and personalty shall be divided equally between Darby Suiter and Kenneth B. Suiter if both brothers are living at that time. If one is deceased at that time then my entire remaining estate shall go to the surviving brother. If my son, Daryl, predeceases me, then I leave all my cash, cd's, stocks bonds, real estate and personalty to my two brothers, Darby Suiter and Kenneth B. Suiter jointly—one-half interest to each. If my brother, Darby Suiter, predeceases me then I leave his one-half interest in my estate as set out above to the three following Trusts, each to share equally: 1. The Angela Dawn Trent Trust 2. The Nicholas Ryan Trent Trust 3. The Justin Wayne Suiter Trust. If Darby Suiter should be living at the time of my death and disclaims his inheritance from me then I bequeath his share to the three Trusts above set out. If my brother, Kenneth predeceases me then I leave his one-half interest in my estate to the same three Trusts. I never want my son, Larry Guthrie, or his heirs to ever have any part of my estate because of the way he has treated me over 25 years.

Because Daryl Guthrie died before his mother, under the terms of the will, the estate was to be shared equally by the testatrix's brothers, Darby and Kenneth Suiter. However, the executor, Darby Suiter, disclaimed his interest, so his share would be divided equally by the three trusts set up to benefit his niece and nephews.

On September 7, 1994, Larry Guthrie, the testatrix's only surviving son, filed this will contest. He alleged that: (1) the testatrix lacked testamentary capacity; (2) the will was not properly executed; (3) the testatrix was unduly influenced by the executor; and (4) the will was procured by fraud. The executor moved for summary judgment on each cause of action asserted by the contestant. After considering the motion for summary judgment and the contestant's response, the trial court granted summary judgment for the executor.

## EXCLUSION OF SUMMARY JUDGMENT EVIDENCE

As a preliminary matter, we address the contestant's third point of error in which he complains the trial court erroneously excluded several items of his summary judgment evidence. Specifically, the contestant contends that the trial court erred by excluding: (1) the affidavit of his mental health expert, Francis J. Pirozzolo, Ph.D.; (2) several exhibits attached to the contestant's own affidavit; and (3) the entire deposition of Darby Suiter. We will address each complaint respectively.

### A. Pirozzolo affidavit

In support of his response to the motion for summary judgment, the contestant attached the affidavit of Francis J. Pirozzolo, Ph.D. In his affidavit, Dr. Pirozolla stated that he had reviewed the following information in reaching his opinion: (1) letters from a Dr. Creed; (2) records from the Ohio Department of Mental Health; (3) the motion for summary judgment; and (4) the affidavits filed in support of the motion for summary judgment. Based on his review of these documents, he concluded the testatrix probably was not competent to make a will.

The executor objected to Dr. Pirozzola's affidavit because it did not attach copies of the documents referenced in the affidavit. Specifically, the executor complains that Dr. Creed's records and the records of the Ohio Department of Mental Health were not attached to Dr. Pirozzola's affidavit.

TEX.R. CIV. P. 166a(f) provides in part:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. *Sworn or certified*

*copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.*

In *Ceballos v. El Paso Health Care Sys.,* 881 S.W.2d 439, 444 (Tex.App.—El Paso 1994, orig. proceeding), two medical experts testified by affidavit about a patient's medical condition. The affidavits referred to medical records that were not included anywhere in the summary judgment evidence. *Id.* The court held the affidavits were insufficient because they did not meet the requirements of rule 166a(f). *Id.* at 445.

■ In this case, Dr. Pirozzola's affidavit fails to meet the requirements of rule 166a(f). Although it refers to letters from Dr. Creed and records from the Ohio Department of Mental Health, those documents are not attached to the affidavit, nor do they appear anywhere in the summary judgment evidence. Therefore, the trial court did not abuse its discretion by refusing to consider Dr. Pirozzola's affidavit.

### B. Attachments to the Affidavit of Larry Guthrie

In his response, the contestant also included his own affidavit, in which he attempted to authenticate two letters purportedly written by the testatrix's mother. The first letter was written to the testatrix's son, Daryl Guthrie, in 1969. In the letter, the testatrix's mother questioned the testatrix's ability to know right from wrong. The second letter was written to a Dr. Jones in 1976. In this letter, the testatrix's mother questioned whether a hysterectomy would "cause her [the testatrix] to be hospitalized in strict confinement for the rest of her life." She also noted that the testatrix "isn't the same" [since the lobotomy]. Both of these letters were attached to the contestant's affidavit.

■ The executor objected to the letters as hearsay; the contestant responded the letters were admissible as ancient documents. Statements contained in documents

20 years old or older qualify as an exception to the hearsay rule, provided the documents are properly authenticated. TEX.R. CIV. EVID. 803(16). To qualify for this exception, the document must be shown (1) in such condition as to create no suspicion concerning its authenticity; (2) that it was in a place where it would likely be if it were authentic; and (3) that it has been in existence 20 years or more at the time it is offered. *Fibreboard Corp. v. Pool,* 813 S.W.2d 658, 694 (Tex. App.—Texarkana 1991, writ denied); TEX.R. CIV. EVID. 901(b)(8).

■ The executor argued the letters were not qualified as ancient documents. We agree. The letter to Dr. Jones was dated December 15, 1976. Therefore, it had not been in existence for 20 years at the time it was offered. The contestant testified that the letter to Darryl Guthrie was a copy of a letter maintained in his personal records and that the original was unavailable. Although he identifies the person who provided the letter, he does not state where the letter was kept. Therefore, the trial court did not abuse its discretion by refusing to consider the attachments to the contestant's affidavit. *Fibreboard,* 813 S.W.2d at 694.

### C. The Darby Suiter deposition

Finally, the contestant contends the trial court erred by refusing to consider the deposition of Darby Suiter, which he attached to his response to the motion for summary judgment. The deposition of Darby Suiter was taken over three days and the transcript is almost 500 pages long. The contestant attached the entire deposition as summary judgment evidence. In his response, he makes only general references to the deposition, never directing the trial court's attention to any particular portion of the 500–page document.

■ The contestant argues that under TEX.R. CIV. P. 166a(d),[1] a party may attach

---

1. Rule 166a(d) provides:
 Discovery products not on file with the clerk may be used as summary judgment evidence if copies of the material, appendices containing the evidence, or a notice containing specific references to other instruments, are filed and served on all parties together with a statement of intent to use the specified discovery as summary judgment proofs: (i) at least twenty-one days before the hearing if such proofs are to used to support the summary judgment, or (ii) at least seven days before the hearing if such

an entire deposition to a motion for summary judgment or response to a motion for summary judgment. Rule 166a(b) provides a mechanism by which the parties may rely on summary judgment evidence that is not already on file with the court. We agree that under rule 166a(d) a party may attach an entire deposition as part of his summary judgment proof. However, the rule does not relieve the party's burden of pointing out to the trial court where in the evidence the issues set forth in the motion or response are raised.

In *Nicholson v. Naficy*, 747 S.W.2d 3, 4 n. 1 (Tex.App.—Houston [1st Dist.] 1987, no writ), this Court refused to consider a portion of a deposition that was attached to a motion for summary judgment, but was not cited, quoted, or otherwise pointed out to the trial court. In *Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 81 (Tex.1989), the movant referred the trial court to the evidence "on file." The court held that a general reference to a voluminous record that does not direct the trial court and the parties to the evidence on which the movant relies is insufficient. *Id.*

In this case, the contestant did not direct the trial court to the portions of the Darby Suiter deposition upon which he was relying. The trial court should not be compelled to sift through a 500–page deposition to search for evidence supporting the contestant's contentions. Therefore, the trial court did not abuse its discretion by refusing to consider the Darby Suiter deposition.

We overrule point of error three.

### PROPRIETY OF SUMMARY JUDGMENT

In points of error one and two, the contestant contends that the trial court erred by granting summary judgment in favor of the executor. The contestant argues that he raised fact questions on each of his causes of action.

### A. Standard of Review

Summary judgment is proper only when a movant establishes there is no genuine issue

proofs are to be used to oppose the summary

of material fact and that the movant is entitled to judgment as a matter of law. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995); *Bangert v. Baylor College of Medicine*, 881 S.W.2d 564, 566 (Tex.App.—Houston [1st Dist.] 1994, writ denied). In reviewing the summary judgment, we must indulge every reasonable inference in favor of the nonmovant and resolve any doubts in its favor. *Johnson*, 891 S.W.2d at 644; *Bangert*, 881 S.W.2d at 565–66. In reviewing the granting of a motion for summary judgment, this Court will take all evidence favorable to the nonmovant as true. *Johnson*, 891 S.W.2d at 644; *Bangert*, 881 S.W.2d at 565.

### B. Movant's Summary Judgment Evidence

In support of his motion for summary judgment, the executor submitted the following proof:

**1. Affidavit of Marilyn Flores.** Flores was present when the testatrix executed her will. During the eight years that Flores knew the testatrix, the testatrix never showed signs of confusion. She was always oriented to time, place and person. The testatrix knew who her family was and could hold those thoughts for an extended period of time. The testatrix had told Flores that one of her sons lived out of town and never contacted her. The testatrix also told Flores that she wanted to provide for the executor in her will because he always took care of her. Flores had witnessed the testatrix transact business.

**2. Affidavit of Maria Gutierrez.** Gutierrez was present when the testatrix executed her will. At the execution of the will the testatrix showed no signs of confusion; she knew who she was and what she was doing. The testatrix was in no way coerced or forced into executing the will.

**3. Affidavit of Marianne McKee.** McKee served as notary public when the testatrix executed her will. During the years that McKee knew the testatrix, the testatrix was always oriented to time, place

judgment.

and person. On the day the will was executed, the testatrix knew who she was, who her family was, and she could hold those thoughts for an extended period of time. The testatrix had told McKee that she had no contact with the contestant for many years. The executor did not coerce the testatrix into executing the will.

**4. Affidavit of Dr. Richard Evans.** Dr. Evans was socially acquainted with the testatrix and the executor. On April 20, 1992, just 10 days after the testatrix's will was executed, Dr. Evans travelled with the testatrix, her husband and the executor to Ohio. During the three-day trip, the testatrix exhibited no abnormal behavior. She was oriented to time, place, and person, and was able to transact business. She exhibited no evidence of confusion, hallucination, or impairment in her ability to think and retain thoughts.

**5. Affidavit of Dr. Victor Salcedo.** Dr. Salcedo treated the testatrix in December 1992 for high blood pressure and seizures. The testatrix was able to relay her medical history, including the fact that she had undergone a lobotomy. The lobotomy did not necessarily affect the testatrix's ability to make a will. The lobotomy left her with a "flat effect." The testatrix exhibited no problem with cognitive function. She was able to transact business and to understand her medical problems and the treatment prescribed.

**6. Affidavit of Dr. Thomas O'Brien.** Dr. O'Brien was the testatrix's dentist. He testified that the testatrix spoke slowly, but she always made perfectly good sense. He did not question her ability to function normally or to make personal or medical decisions. She was never disoriented in his presence.

**7. Affidavit of Dr. William Fann.** Dr. Fann is a psychiatrist, and testified as an expert in this case. He reviewed the affidavits provided by the witnesses listed above and concluded that despite her frontal lobotomy, there was no basis to conclude that the testatrix was mentally incompetent or unable to make a will. He stated that "[w]hile a certain percentage of frontal lobotomy patients experience nega-tive results from the procedure, many suffer no adverse consequences sufficient to cause loss of their ability to know (i) who they are, (ii) what property they own, (iii) who the natural objects of their bounty are, and (iv) what disposition they wish to make of their property upon their deaths, nor cause them to be unable to hold all of these thoughts together at one time long enough to execute a will."

**8. Affidavit of H. Campbell Wood, Jr.** Wood was the testatrix's step-son. He testified that the testatrix was capable of marrying, and that she and his father had a good relationship. Wood stated that she was capable of signing a will, and that she knew who her family members were. She was capable of transacting business. He was around her frequently in 1992, and had discussed her will with her. She specifically told him that she did not want the contestant to receive anything from her estate because she had not been in contact with him for over 20 years. She wanted the executor to receive her property.

**9. Affidavit of Sandra Willis.** Willis worked as a housekeeper for the testatrix from April 1992 until the testatrix's death. Willis believed that there was nothing wrong with the testatrix mentally. The testatrix was able to transact business, and she always paid her the right amount.

#### C. Nonmovant's Summary Judgment Evidence

In opposition to the executor's motion for summary judgment, the contestant presented the following summary judgment evidence:

**1. Affidavit of Lillie Turbin.** Turbin was a home health care provider who provided services to the testatrix in September 1992, several months after the will was executed. Turbin testified that the testatrix rarely spoke or left her rocking chair. The testatrix's husband had to tell her when to eat and what medicine to take because she was unable to do so for herself. Turbin testified that the testatrix did not appear fully aware of her surroundings. She appeared to be like a person who had Alzheimer's disease and did not speak or relate to people in a normal man-

ner. To Turbin, the testatrix was not mentally competent to handle her own affairs.

**2. Affidavit of Rina Bayona.** Bayona was also a home health care provider who provided services to the testatrix in August 1992, several months after the will was executed. To Bayona, the testatrix appeared to be a person who was "very dumb in appearance" and not reacting to people around her. The testatrix could not take care of herself and did not bathe regularly. Her home was strewn with garbage. The testatrix stared blankly without normal emotion or attention. To Bayona, the testatrix did not appear to be a mentally competent person.

**3. Affidavit of Mary Beth Jameson.** Jameson was the receptionist for the veterinarian who treated the testatrix's dogs. She knew the testatrix from 1985 to 1993. Jameson testified that the testatrix appeared to be in a continuous and chronic state of confusion. Instructions about the care of the testatrix's dogs had to be repeated numerous times. The testatrix appeared and acted as if she were medicated, and her responses were not those of a person regularly in control of her thoughts. The testatrix would either pay cash or would write her check out for whatever amount Jameson told her. Jameson was of the opinion that the testatrix would write the check for whatever amount she was told without ever questioning the import of what she did. She was able to follow simple instructions, but did so without independent judgment. On one occasion, the executor told Jameson that the testatrix was unable to care for herself, much less her dogs. Jameson understood this statement to mean that the testatrix's mental condition was a continuous state, not one just then occurring.

**4. Affidavit of Emily Guthrie.** Emily is the contestant's daughter and the testatrix's granddaughter. When she was 17 (in 1990), Emily first met her grandmother. To her, the testatrix did not appear to have the normal range of human emotions. Her relationships with people, including her husband, appeared to be superficial. The testatrix appeared to be unable to engage in any conversation beyond basic pleasantries. She was very compliant and did not appear to have a mind of her own. When the testatrix sent birthday cards, she often sent two cards for the same occasion. It did not appear to Emily that the testatrix had the presence of mind or competence to dispose of her estate.

**5. Affidavit of Larry Guthrie.** Larry Guthrie, the testatrix's son and the contestant to her will, testified that shortly after his birth his mother was admitted to a mental hospital in Ohio with "dementia praecox." After five years of treatment, she underwent a lobotomy. The contestant testified that, as a result of the lobotomy, the testatrix was never able to demonstrate a normal mother/son relationship. After his parents' divorce, the testatrix never sought custody or visitation. The contestant lived in Houston from 1969 to 1975. During that time, he knew the executor. The contestant was of the opinion that the executor was manipulative and capable of exercising great influence over the testatrix. The executor acted as the testatrix's primary business and financial contact, as well as her caretaker and attorney. The testatrix was easily led by the executor. The contestant testified that the testatrix, throughout her adult life, was without sufficient mental ability to make a will, to "know her son as a normally mentally functioning mother should," or to know the natural objects of her bounty.

**6. Medical Records from Houston Chest Internists.** The medical records cover a period of time from the late 1960s to a few months before the testatrix's death in 1993. The record show a medical history of a lobotomy in the 1950s with resulting seizures that were controlled by taking Dilantin. The records show that on a few occasions over the years, the testatrix's treating doctor noted some "confusion." On one occasion in 1971, she suffered a "depressive episode." In 1981, she was admitted to the hospital with seizures after she failed to take her Dilantin properly. In 1989, she was brought to the ER with inappropriate language and convulsive activity. On examination she was able to

follow simple commands, but was unable to name or repeat. She was treated with an increase of Dilantin. Most of the remaining medical records detail normal physical ailments.

**7. Business records of Astro Care Visiting Health Professionals.** The records cover a period from July 1992 to October 1992. The records indicate the testatrix was homebound by this time (several months after the execution of the will). The records indicate that the testatrix was alert and oriented; on a few occasions it was noted that she was forgetful. She was often dirty and refused to take a bath. The service assisted the testatrix in cleaning her home, preparing meals, taking her medicine, and monitoring her health.

## D. Causes of Action Addressed by Motion for Summary Judgment

In his motion for summary judgment, the executor addressed each cause of action raised by the contestant's petition: (1) lack of testamentary capacity, (2) manner and form of execution, (3) undue influence, and (4) fraud. We will address each cause of action in light of the summary judgment evidence detailed above.

### 1. Testamentary Capacity

 Testamentary capacity means possession of sufficient mental ability at the time of execution of the will, (1) to understand the business in which the testatrix is engaged, the effect of making the will, and the general nature and extent of her property, (2) to know the testatrix's next of kin and the natural objects of her bounty, and (3) to have sufficient memory to assimilate the elements of the business to be transacted, to hold those elements long enough to perceive their obvious relation to each other, and to form a reasonable judgment as to them. *Prather v. McClelland,* 76 Tex. 574, 13 S.W. 543, 546 (1890); *Hoffman v. Texas Commerce Bank, N.A.,* 846 S.W.2d 336, 340 (Tex.App.—Houston [14th Dist.] 1992, writ denied).

 When a proponent offers a will for probate, the burden of proving testamentary capacity is on the proponent. *James v. Haupt,* 573 S.W.2d 285, 288 (Tex.Civ.App.—

Tyler 1978, writ ref'd n.r.e.). To admit a will to probate, a trial court must find that the will is valid under the probate code. One of the requirements of validity is that the testator or testatrix has testamentary capacity. Once a self-proved will is admitted into evidence, the proponent has established prima facie that the will has been properly executed, and the contestant must go forward with evidence to overcome the prima facie case. *James,* 573 S.W.2d at 288. A self-proving will with proper affidavits requires no further proof of testamentary capacity and may be admitted to probate without further evidence. TEX. PROB.CODE ANN. art. 59 (Vernon Supp.1996).

 Before the will contest was filed in this case, the executor offered the executrix's self-proving will for admission to probate. After finding that the will complied with article 59 of the probate code, the trial court admitted the will to probate. The executor attached the self-proving will, which had already been admitted to probate, to his motion for summary judgment. Thus, the executor made a prima facie showing that the testatrix possessed testamentary capacity at the time she executed her will.

 Rather than relying solely on the self-proving will, the executor also introduced the affidavits of Marilyn Flores, Maria Gutierrez, and Marianne McKee. All three witnesses were present when the testatrix executed her will and testified that the testatrix showed no signs of confusion when she signed her will. Dr. Evans testified that during a three-day trip just 10 days after the execution of the will, the testatrix was not confused, impaired, or unable to transact business. Dr. O'Brien testified that during the time he served as the testatrix's dentist she was always able to function normally. Dr. Salcedo testified that although the testatrix's lobotomy left her with a "flat effect," she exhibited no problems with cognitive function. Dr. Fann, after reviewing the affidavits of the executor's other witnesses, concluded that despite the lobotomy, the testatrix was able to know who she was, what property she owned, who the objects of her bounty were, what disposition of her proper-

ty that she wished to make, and was able to hold these thoughts long enough to make a will. Without controverting evidence, this record would support summary judgment for the testator. See *Hammer v. Powers,* 819 S.W.2d 669, 671 (Tex.App.—Fort Worth 1991, no writ) (absent summary judgment response, record sufficient to show testamentary capacity). Thus, it was incumbent upon the contestant to raise a fact question about the testatrix's testamentary capacity.

In a will contest on the ground of testamentary incapacity, the issue is the condition of the testator's mind on the date the will was executed. *Wilkinson v. Moore,* 623 S.W.2d 662, 663–64 (Tex.App.—Houston [1st Dist.] 1981, writ dism'd). The contestant was not able to provide any direct evidence of the testatrix's mental condition on the date the will was executed. Therefore, the executor contends that the contestant's summary judgment proof does not raise a question of fact about testamentary capacity. However, the contestant did produce evidence to suggest that the testatrix was mentally incompetent on occasions both before and after the date the will was executed. Evidence of incompetency at other times can be used to establish incompetency on the date the will was executed if it demonstrates that the condition persists and has some probability of being the same condition which obtained at the time of the will's making. *Croucher v. Croucher,* 660 S.W.2d 55, 57 (Tex.1983); *Wilkinson,* 623 S.W.2d at 664.

In *Croucher,* the proponent of the will had the burden to prove that the testator had testamentary capacity. She introduced evidence to show that the decedent had testamentary capacity on the date the will was executed. 660 S.W.2d at 56–57. The contestants to the will did not provide any direct evidence that the decedent lacked testamentary capacity. However, there was proof that during the year before the execution of the execution of the will, the decedent had a brain scan that showed a diminished flow of blood to the brain. *Id.* at 56. Six months before the will was executed, the decedent had a leg amputated. At that time, a neurological examination showed that his memory was sketchy and he seemed confused. One month after the will was executed, there was evidence that the decedent was suffering from arteriosclerotic cardiovascular disease resulting in a decreasing mental status. *Id.* Even though there was no direct evidence of incapacity on the day the will was executed, the court held there was some evidence of lack of testamentary capacity because the evidence showed the decedent had a failing memory due to arteriosclerosis both before and after the will was executed. *Id.* at 57–58.

In this case, the contestant did not present evidence of the testatrix's mental ability on the date the will was executed. His summary judgment proof shows that the testatrix underwent a lobotomy in the 1950s. Dr. Fann, the executor's expert, conceded that a "certain percentage of frontal lobotomy patients experience negative results from the procedure." The contestant and his daughter Emily presented evidence that during the years before the will was executed, the testatrix did not appear to be able to maintain normal relationships with people. Emily testified that the testatrix did not appear to have a mind of her own. The contestant testified that throughout her adult life, the testatrix was without sufficient mental ability to make a will.

Mary Beth Jameson, the veterinarian's receptionist, testified that the testatrix was only able to follow simple instructions, and did so without exercising independent judgment. Jameson had heard the executor say that his sister was not able to take care of herself. She understood that the testatrix's condition was a continuous one.

There was also evidence that the testatrix's mental incapacity continued after she executed the will in April 1992. Lillie Turbin and Rena Bayone, home health care providers who saw the testatrix in August and September of 1992, both testified that the testatrix did not appear mentally competent to handle her own affairs.

There is some evidence that as a result of the lobotomy, the testatrix suffered a diminished capacity that persisted during the time the will was executed. The evidence of the lobotomy, coupled with the evidence of mental incapacity both before and after the exe-

cution of the will, raises a fact question as to whether the testatrix had testamentary capacity on the date the will was executed. Therefore, the trial court erred by granting summary judgment on the testamentary capacity cause of action.

## 2. Manner and Form of Execution

In his petition, the contestant also contended that the testatrix's will did not meet the requirements for admission to probate. Specifically, the contestant argued that the testatrix did not possess the mental capacity necessary to form the requisite testamentary intent. An instrument is not a "will" unless it is executed with testamentary intent. *Hinson v. Hinson*, 154 Tex. 561, 280 S.W.2d 731, 733 (1955). For the same reasons that we found a question of fact as to the testatrix's testamentary capacity, we also find that there is a question of fact as to her testamentary intent.

## 3. Undue Influence

Before a will can be set aside because of undue influence, the contestant must prove: (1) the existence and exertion of an influence; (2) the effective operation of that influence so as to subvert or overpower the testator's mind at the time of the execution of the testament; and (3) the execution of a testament which the maker would not have executed but for such influence. *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963). Not every influence exerted on a person is undue. *Id.* It is not undue unless the free agency of the testatrix was destroyed and the will produced expresses the wishes of the one exerting the influence. *Id.* One may request, importune, or entreat another to create a favorable dispositive instrument, but unless the importunities or entreaties are shown to be so excessive as to subvert the will of the maker, they will not taint the validity of the instrument. *Id.*

Establishing the existence of undue influence generally involves inquiry into factors such as:

1. the circumstances surrounding execution of the instrument;

2. the relationship between the testator and the beneficiary and any others who might be expected recipients of the testator's bounty;

3. the motive, character, and conduct of the persons benefitted by the instrument;

4. the participation by the beneficiary in the preparation or execution of the instrument;

5. the words and acts of the parties;

6. the interest in and opportunity for the exercise of undue influence;

7. the physical and mental condition of the testator at the time of the will's execution, including the extent to which she was dependent upon and subject to the control of the beneficiary; and

8. the improvidence of the transaction by reason of unjust, unreasonable, or unnatural disposition of the property.

*Mackie v. McKenzie*, 900 S.W.2d 445, 449 (Tex.App.—Texarkana 1995, writ denied). Although a contestant may prove undue influence by circumstantial evidence, the evidence must be probative of the issue and not merely create a surmise or suspicion that such influence existed at the time the will was executed. *Reynolds v. Park*, 485 S.W.2d 807, 813 (Tex.Civ.App.—Amarillo 1972, writ ref'd n.r.e.).

We will review the above-referenced factors in light of the summary judgment evidence produced to determine whether the contestant raised a question of fact about undue influence. A fact issue is raised by circumstantial evidence if, from the evidence, a reasonable person would conclude that the existence of the facts is more reasonable than its nonexistence. *Smith v. Tennessee Life Ins. Co.*, 618 S.W.2d 829, 834 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ). All that is required is that the circumstances point to ultimate facts sought to be established with such a degree of certainty as to make the conclusion reasonably probable. *Id.* For the evidence to be sufficient to raise a fact question on undue influence, it must be more than purely speculative. *Kirkpatrick v. Raggio*, 319 S.W.2d 362, 366 (Tex.Civ. App.—Fort Worth 1958, writ ref'd n.r.e.). No fact issue is raised where the evidence is

so indefinite and uncertain as to preclude a finding. *Id.*

■ The summary judgment evidence provides very little information about the circumstances under which the will was executed. However, the affidavits of Marilyn Flores, Maria Gutierrez, and Marianne McKee establish that the executor was present when the testatrix signed the will. There is also evidence that the executor "took care of" the testatrix. The contestant testified that the executor acted as the testatrix's primary business and financial contact, and also acted as her caretaker during the many years that she lived in Houston. He also states that the executor was the only lawyer that the testatrix ever dealt with. The contestant stated that "[t]he constant contact and interpersonal reliance of [the testatrix] with [the executor] together with the lasting permanent effect of the lobotomized brain of [the testatrix], effectively presented a situation and environment by which [she] was easily and conveniently lead by the strong and persistent influence of her brother/attorney/financial advisor, [the executor]."

■ From this evidence, a jury could reasonably conclude that the executor had the *opportunity* to unduly influence the testatrix. However, the evidence is equally consistent with the absence of undue influence and raises nothing more than a suspicion or surmise regarding the actual *exercise* of undue influence by the executor. Mere opportunity to unduly influence a testatrix is no proof that influence has actually been exerted. *Miller v. Flyr,* 447 S.W.2d 195, 202–03 (Tex.Civ. App.—Amarillo 1969, writ ref'd n.r.e.).

■ In addition to the close relationship between the executor and the testatrix, the contestant relies on the fact that the testatrix had undergone a lobotomy several decades earlier. Undue influence assumes the existence of testamentary capacity. *Rothermel,* 369 S.W.2d at 922. However, evidence of impaired mentality not amounting to testamentary incapacity may afford an opportunity for the exercise of undue influence. *Lowery v. Saunders,* 666 S.W.2d 226, 233 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.). A testatrix's weakened physical and mental condition is only indicative of her susceptibility to influence; it is no evidence that such influence exists in fact. *Reynolds,* 485 S.W.2d at 813.

■ The fact that the testatrix's lobotomy may have rendered her susceptible to undue influence is again no evidence that such influence was in fact exerted upon her. There is nothing in the record to show that the executor coerced, intimidated, or otherwise forced the testatrix to create a will that favored him. While the fact that the executor "took care of" the testatrix during her life may have influenced her decision to leave half her estate to him, we cannot characterize such influence as "undue." Wills executed through love, kindness, and gratitude are not caused by undue influence in the eyes of the law. *Brewer v. Foreman,* 362 S.W.2d 350, 356 (Tex.Civ.App.—Houston 1962, no writ).

■ Finally, the contestant argues that the testatrix made an unnatural disposition of her property by totally excluding her only living son. However, it is undisputed that the contestant and his mother rarely spoke to one another. Given the evidence of the strained relationship between the testatrix and the contestant, the disposition does not seem unreasonable. Indeed, the testatrix told several people that she had no relationship with the contestant. She even expressed her dissatisfaction concerning what she considered to be his neglect in her will.

■ The circumstantial evidence relied on by the testator does no more than surmise that the executor unduly influenced the testator and does not raise a question of fact on the issue. Circumstances that are as consistent with a will executed free from improper influence as they are with a will resulting from undue influence cannot be considered as evidence of undue influence. *Mackie,* 900 S.W.2d at 450.

### 4. Fraud

■ The executor also moved for summary judgment on the contestant's fraud claim, which the trial court granted. The contestant contends that he also raised a fact question on this cause of action. Fraud in the factum is present when the testator is

misled as to the nature or content of the instrument executed. *See Sockwell v. Sockwell*, 166 S.W. 1188, 1188 (Tex.Civ.App.— Texarkana 1914, writ dism'd). The record in this case is totally devoid of any evidence that the executor misled the testatrix about the nature and content of her will. Therefore, the contestant has failed to raise a question of fact on the issue of fraud in the factum.

██ Undue influence and fraud in the inducement of a dispositive instrument are sometimes viewed as separate and distinct grounds for invalidating a will. *Holcomb v. Holcomb*, 803 S.W.2d 411, 415 (Tex.App.— Dallas 1991, writ denied). However, Texas courts treat the two as one, viewing undue influence as a species of legal fraud. *Id.* Therefore, for the same reason that we found no question of fact on the undue influence claim, we also find no question of fact on the fraudulent inducement claim.

We affirm the summary judgment as to the contestant's claims of undue influence and fraud. However, we reverse the summary judgment as to the contestant's claims of lack of testamentary capacity and lack of testamentary intent, and remand those claims for further proceedings.