Opinion issued April 20, 2021



In The

# Court of Appeals

### For The

# First District of Texas

———————————

## NO. 01-19-00299-CV

———————————

## IN THE ESTATE OF BILLY JOE WLECYK
## A/K/A BILLY JOE WLECZYK, DECEASED

---

### On Appeal from County Court at Law No. 3
### Brazoria County, Texas
### Trial Court Case No. PR38384

---

## MEMORANDUM OPINION

Appellant, Barbara Daniel, challenges the trial court's order, entered after a bench trial, admitting to probate the August 9, 2001 Last Will and Testament (the "2001 will") of Billy Joe Wlecyk, also known as Billy Joe Wleczyk ("Billy Joe"), after finding that it was revived by a holographic codicil written and signed on July

15, 2016 (the "2016 codicil"). In three issues, Daniel contends that the trial court erred in admitting the 2001 will and the 2016 codicil to probate.

We affirm.

## Background

Billy Joe died on January 30, 2018. On February 1, 2018, Sharon Reed, his daughter, filed an Application for Probate of Will and Letters Testamentary, alleging that "[Billy Joe] resided in in Brazoria County, Texas at the time of his death" and that he left the 2001 will, "dated August 9, 2001 and ratified on July 15, 2016, duly executed with all the formalities and solemnities required by law to make it a valid will, and [it] was never revoked by [Billy Joe]."

Reed attached the 2001 will to her application. The 2001 will names Reed as independent executrix. It identifies "Jerry W. Wleczyk, Debbie C. Wleczyk, All[a]n W. Wleczyk and Sharon D. Reed" as Billy Joe's children and provides for payment of Billy Joe's "[d]ebts, [e]xpenses, and [d]eath [t]axes," with the remaining property to be given "to [his] children who survive [him], in equal shares," or, if not surviving, to those children's descendants, or otherwise to "then living blood related [h]eirs at [l]aw." In an open space on the bottom of the page, following the second of two self-proving affidavits attached to the 2001 will, a handwritten note reads, "This will still stands July 2016," followed by a handwritten signature reading "Billy Joe Wleczyk." Another page follows, containing a jurat reciting that the document was

2

"signed and sworn to" in Brazoria County "on this 15[th] day of July 2016 by the said Billy Joe Wleczyk" before Kimberly Miller, and contains Miller's signature, notary public seal, and the expiration date of her notary public commission.

On February 14, 2018, Daniel filed a counter-application to probate a will executed by Billy Joe on August 23, 2005 (the "2005 will"). In her counter-application, Daniel alleged that the 2005 will remained in effect and she contested the effectiveness of "the written notation alleged to be in the [Billy Joe's] handwriting at the bottom of the [2001 will] to qualify . . . as a new [w]ill or publishing of a prior [w]ill." According to Daniel, the 2016 codicil was made by fraud.

Daniel attached to her counter-application the 2005 will. The 2005 will names Daniel as independent executrix. It directs that each of his children receive $25.00 in cash and "all of the rest of [his] estate" be given "to [his] good friend, [Daniel]," or, if she predeceased him or did not survive him by thirty days, "to [Daniel's] son, Mark Travis Daniel."

At the trial of the will contest, Miller testified that she has been an administrative assistant for a sheriff's department for over twenty years and holds a notary public commission in connection with that employment. Reed is her co-worker and has been for many years. Miller "worked a couple of fundraisers for work" with Reed, but they did not socialize at each other's homes or go out for meals

3

or drinks together. She had met Billy Joe twice, once at Reed's mother's funeral and another time at a fundraiser.

On July 15, 2016, Miller received a call from Reed asking her to witness and notarize Billy Joe's writing and signature at the home of Reed's brother and Billy Joe's son, Allan Wleczyk ("Allan"). Reed knew that Miller lived in the city of Sweeny, in Brazoria County, as did Allan, so "[s]he was the closest" co-worker who was a notary public, "and [Reed] happened to call and [Miller] had gotten off work early that day and [she] happened to be home."

Miller arrived at Allan's home midafternoon. Present at the home were Billy Joe, Reed, Allan, and Allan's wife, Pamela Wleczyk ("Pamela"). Miller was aware that before she arrived, Billy Joe had been working "in the hayfield" next to Allan's home.

The group stood in the driveway of Allan's home while Billy Joe wrote, "This will still stands July 2016," and signed his name underneath. Billy Joe used a pen that he had in his pocket and used the hood of a car as his writing surface. Either right before or right after he made the writing, Billy Joe said, "This is the one I want to use." (Internal quotations omitted.)

Miller notarized Billy Joe's signature using a printed notary page that she brought from home, where she "kept a few" extra pages in a folder, "just in case" someone asked her to perform notary services outside of work. According to Miller,

4

the weather was hot, and Billy Joe looked "maybe a little agitated," but he appeared to be of sound mind and body.

Reed testified that she is the daughter of Billy Joe, who died while he was baling hay on or about January 30, 2018, in Brazoria County. Billy Joe was seventy-seven years old when he died. Reed confirmed that she was asking the court to admit to probate her father's 2001 will, which he republished as his last will and testament on July 15, 2016, thereby revoking his 2005 will. The 2001 will leaves all Billy Joe's property "to [Reed] and [her] two brothers and [her] sister." Those four individuals were all of Billy Joe's children; he had no other children, either by birth or by adoption.

According to Reed, Billy Joe had been married four times: once to Reed's mother, once to Maxine Strid, and twice to Sandra Ducrose. The final divorce decree ending his last marriage, to Ducrose, was signed in March 2002.

Reed understood that the 2005 will executed by Billy Joe leaves all Billy Joe's property to Daniel, or to Daniel's son. Daniel was Billy Joe's "live-in friend."

Reed was present when Billy Joe wrote the 2016 codicil on the 2001 will. Earlier in the afternoon on that day, Billy Joe had called her and asked what she was doing. She told him that she was at home preparing to go camping, and he asked, "Can you bring me the will? Do you still have the will? . . . I need to write something on it." (Internal quotations omitted.) Reed removed the 2001 will from her "gun

5

safe," where she had stored it for safekeeping, and brought it to Billy Joe, who was at Allan's home. Allan, Pamela, and Miller also were there. Reed handed Billy Joe the 2001 will, and "[h]e put it on the hood of [Reed's] car and pulled a pen out of his shirt." Then, using the car hood as a writing surface, Billy Joe wrote, "This will still stands," and placed his signature underneath the writing. (Internal quotations omitted.) As he was writing, he had "ink issues" with his pen and "had to kind of keep going over the first letter," and he "started griping about the pen."

Pamela testified that she has been married to Allan for nearly six years. On July 15, 2016, she was driving her golf cart on their property to bring Billy Joe and Allan, who had been working in the hayfield next to the house, something to drink. As she pulled up in front of the driveway, she saw Billy Joe walking toward Reed's car. Reed had brought some papers and "had gotten out of her car and [Billy Joe] was . . . writing on them." Pamela "didn't really know what was going on" and she "didn't ask," but she saw Billy Joe writing on the papers on the hood of Reed's car. No one told Billy Joe what to do, and he appeared to be of sound mind and body and to be making the writing of his own free will. Pamela was too far away to see what Billy Joe was writing, but she was familiar with Billy Joe's handwriting from having seen "a couple of checks" he had written to her husband and birthday cards that he had signed. She recognized the 2016 codicil as being in Billy Joe's handwriting.

Pamela also testified that "not too long before" Billy Joe wrote the 2016 codicil, Daniel told her that Billy Joe had been trying to make her move out of his house. Daniel "was just talking about [Billy Joe] and how mean he was to her and he wanted her to leave . . . ." Pamela said, "Well, why don't you leave," and Daniel responded, "I don't want to go live with my dad." (Internal quotations omitted).

Allan testified that he was a planner at a chemical plant and participated in a "hay business" with Billy Joe. Allan would "help [Billy Joe] with his [hay]field and [Billy Joe would] help[] [Allan] with [his] field." Allan was present when Billy Joe wrote and signed the 2016 codicil. At the time, Billy Joe appeared to be of sound mind and body, and to know what he wanted. Allan did not see anyone pressure Billy Joe into writing the codicil.

Wendy Sue Carlson, a forensic document examiner and handwriting expert, testified that she had been retained by Daniel to compare the handwriting and signature on the 2016 codicil to thirty-six other samples of Billy Joe's handwriting and signature. Carlson described her process for comparing and analyzing handwriting samples. She first determined that the thirty-six samples were "authored by a single individual." She concluded that the 2001 will and the 2005 will were signed by the same individual. As for the 2016 codicil handwritten on the 2001 will, though, she found that the "signature . . . was authored by a different person than the person who signed the . . . signatures on the other [thirty-six

samples]." Carlson also described what she considered to be "dissimilarities" between the signature on the 2016 codicil and the signatures on the thirty-six samples.

At Daniel's proffer, the trial court admitted into evidence the deposition testimony of Morris Bosak. In his deposition, Bosak testified that he had known Billy Joe "since grammar school, rode the bus with him to school and so forth for many years" and had known him "continually since 1955." Beginning in about 1994, Bosak, a certified public accountant, had prepared the decedent's annual tax returns for him.

Bosak served as a witness to the execution of the 2005 will. At that time, he was sharing office space with the attorney who drafted the will for Billy Joe. That attorney, Fred Wilson, and his paralegal, Veronica Rodriguez, who was a notary public, were present, along with Bosak, when Billy Joe executed the 2005 will. Bosak recalled that Wilson asked Billy Joe, "Is this your Last Will and Testament? . . . [A]re you . . . willing to state that this is your Last Will and Testament?" And Billy Joe said, "Yes, I do."

Daniel testified that she lived with Billy Joe at his residence from 2003 until his death in 2018. Daniel and Billy Joe worked together in the hay business and would harvest and bale hay for customers.

Daniel asserted that the 2016 codicil was fraudulent, because on the date Billy Joe allegedly signed the 2016 codicil, she was with Billy Joe "in the hayfield on County Road 25 loading round bales of hay." The customers' trailer could only "carry [thirteen] bales at a time and then they were transporting them to their ranch [and] unloading [them,] and they would . . . make a return trip," so the work "was rather extensive."

After trial, the court entered an order admitting the 2001 will and the 2016 codicil to probate and appointing Reed as independent executor. Daniel then made a request for findings of fact and conclusions of law. Pertinent to this appeal, the trial court entered these findings of fact and conclusions of law:

- "Billy Joe . . . executed a holographic [c]odicil on July 15, 2016, when he wrote and had notarized the handwritten statement: 'This Will still stands July 2016.' Four witnesses, including the notary, testified that they either saw him write the statement or saw him writing something on the [2001 will]. Moreover, one expert witness testified that in her opinion the handwriting was not that of Billy Joe . . . ."

- "Th[e] handwritten statement on the last page of the [2001 will] qualifies as a holographic [c]odicil."

- "[A] preponderance of the credible evidence presented at trial" proves "that the holographic [c]odicil from July 15, 2016, is the handwriting and signature of Billy Joe . . . ."

- "The holographic [c]odicil of July 15, 2016, revived the [2001] will and impliedly revoked the [2005 will] because their dispositions of the estate of Billy Joe . . . are completely contrary."

9

- "Therefore, since the [2005 will] is revoked, the [2001 will] and July 15, 2016[] holographic [c]odicil are admitted to probate."

## Standard of Review

We review a trial court's ruling on a probate application for an abuse of discretion. *In re Estate of Setser*, No. 01-15-00855-CV, 2017 WL 444452, at *2 (Tex. App.—Houston [1st Dist.] Feb. 2, 2017, no pet.) (mem. op.). When a trial court rules arbitrarily or unreasonably without reference to guiding rules or principles, it abuses its discretion. *Id.* It likewise abuses its discretion if it incorrectly construes or applies the law, because a trial court does not have any discretion to misconstrue or misapply the law. *Id.*

Under the abuse-of-discretion standard, legal and factual sufficiency of the evidence are not independent grounds for asserting error, but they are relevant factors in assessing whether the trial court abused its discretion. *Dunn v. Dunn*, 177 S.W.3d 393, 396 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). We give the trial court's fact findings the same weight as a jury's verdict. *Thompson v. Smith*, 483 S.W.3d 87, 93 Tex. App.—Houston [1st Dist.] 2015, no pet.). In conducting a legal-sufficiency review, we review all of the evidence in a light favorable to the finding, crediting favorable evidence if a reasonable fact finder could do so and disregarding contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 810, 827 (Tex. 2005). We are mindful that the

trial court, as the fact finder, was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *See id.* at 819; *McKeehan v. Wilmington Sav. Fund Soc'y, FSB*, 554 S.W.3d 692, 698 (Tex. App.—Houston [1st Dist.] 2018, no pet.). Thus, the trial court may choose to believe one witness and disbelieve another. *McKeehan*, 554 S.W.3d at 698; *see City of Keller*, 168 S.W.3d at 819. It is the fact finder's role to resolve conflicts in the evidence, and we may not substitute our judgment for that of the fact finder. *See McKeehan*, 554 S.W.3d at 698.

Challenged fact findings are binding only if sufficient proof supports them. *Thompson*, 483 S.W.3d at 93; *see also Miles v. Peacock*, 229 S.W.3d 384, 389 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (trial court does not abuse discretion when there is some evidence of substantive and probative character to support trial court's judgment). Unchallenged fact findings, however, are controlling unless the contrary is proven as a matter of law or there is no evidence to support them. *In re Estate of Setser*, 2017 WL 444452 at *2; *see McAleer v. McAleer*, 394 S.W.3d 613, 620 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

**Admission of the 2016 Codicil and the 2001 Will to Probate**

In her first issue, Daniel argues that the trial court erred in admitting the 2016 codicil and the 2001 will to probate because the codicil is legally insufficient to revive the 2001 will and revoke the 2005 will. In her second issue, Daniel argues that the trial court erred in failing to admit the 2005 will to probate because the 2016 codicil could not have revoked the 2005 will. In her third issue, Daniel argues that the trial court in admitting the 2016 codicil and the 2001 will to probate because the preponderance of the evidence did not show that Billy Joe executed the 2016 codicil. We address Daniel's first and second issues together before turning to her third issue.

The proponent of an application to admit a will to probate carries the initial burden of proof. *In re Estate of Danford*, 550 S.W.3d 275, 281 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *Guthrie v. Suiter*, 934 S.W.2d 820, 829 (Tex. App.—Houston [1st Dist.] 1996, no writ); *see* TEX. EST. CODE ANN. § 262.152(a)(1). Among other things, the proponent must prove that the testator had testamentary capacity when the testator executed the will and that the testator did not revoke the will. TEX. EST. CODE ANN. § 256.152(a); *Ashley v. Usher*, 384 S.W.2d 696, 698 (Tex. 1964).

12

A written will may be revoked by "a subsequent will, codicil, or declaration in writing that is executed with like formalities." TEX. EST. CODE ANN. § 253.002.[1] A party seeking revocation by a subsequent will must prove "that the subsequent instrument was executed at a time when the [maker] was of sound mind and disposing memory." *Harkins v. Crews*, 907 S.W.2d 51, 58 (Tex. App.—San Antonio 1995, writ denied).

A codicil that contains a sufficient reference to a prior will operates as a republication of the will as much as the codicil does not alter or revoke it. *Hinson v. Hinson*, 280 S.W.2d 731, 735 (Tex. 1955); *In re Estate of Hargrove*, No. 04-18-00355-CV, 2019 WL 1049293, at *2 (Tex. App.—San Antonio Mar. 6, 2019, pet. denied) (mem. op.). If the reference is sufficient, "the will and codicil are then to be regarded as one instrument speaking from the date of the codicil." *Hinson*, 280 S.W.2d at 735.

Daniel argues that the 2016 codicil is legally insufficient to revoke the 2005 will, which "was typewritten and executed by two witnesses," because the 2016 codicil, which consists of "handwritten notations on the 2001 [w]ill" was not executed with "like formalities." Texas Estates Code section 253.002 sets forth the requirement that a will be executed with "like formalities." *See* TEX. EST. CODE

---

[1] The Texas Estates Code's definition of "[w]ill" includes a "codicil." TEX. EST. CODE ANN. § 22.034(1) (internal quotations omitted).

ANN. § 253.002 ("A written will, or a clause or devise in a written will, may not be revoked, except by a subsequent will, codicil, or declaration in writing that is executed with like formalities . . . .").

"Like formalities" means "under the formalities required to establish a valid will." *Wells v. Royall Nat'l Bank*, 249 S.W.2d 695, 698 (Tex. App.—Galveston 1952, writ ref'd n.r.e.). It "does not mean that a typewritten, attested will can be revoked only by a later typewritten, attested instrument, or that a holographic will can be revoked only by a later holographic instrument." *Cason v. Taylor*, 51 S.W.3d 397, 410–11 (Tex. App.—Waco 2001, no pet.). "A holographic will can revoke an attested will, and vice versa, so long as the revoking instrument is in accordance with the legal requirements." *Id.*; *see In re Estate of Brown*, 507 S.W.2d 801, 806 (Tex. App.—Dallas 1974, writ ref'd n.r.e.).

"The issue of whether a revoking will is executed with like formalities is ordinarily a question of fact to be determined by the fact finder." *In re Rogers*, 895 S.W.2d 375, 378 (Tex. App.—Tyler 1994, writ denied). To be valid, a holographic will must be wholly written in the testator's handwriting and signed by the testator. TEX. EST. CODE ANN. § 251.052.

The record supports the trial court's finding that the 2016 codicil meets these requirements. Miller, Reed, and Allan all testified that they watched as Billy Joe wrote and signed the codicil. From the end of the driveway, Pamela saw Miller,

14

Reed, and Allan standing near Billy Joe as Billy Joe leaned over the hood of a car and appeared to be writing. Pamela recognized the signature on the 2016 codicil as that of Billy Joe. Daniel testified that Billy Joe could not have been at Allan's home on the date the codicil was signed because he was with her helping customers from their hay business load hay that day. We defer to the trial court's resolution of any conflicts in the evidence on this issue. *See McKeehan*, 554 S.W.3d at 698.

Daniel also argues that, because the 2016 codicil "makes absolutely no reference to the 2005 will," it is ambiguous and lacks a sufficient reference to the prior will as required to revive the 2001 will. This argument challenges the trial court's interpretation of the codicil's meaning. In determining the meaning of the words used by the testator, we generally give them their plain, ordinary meaning unless the will shows that the testator used them in another sense. *In re Estate of Hunt*, 597 S.W.3d 912, 916 (Tex. App.—Houston [1st Dist.] 1994, no pet.). A will is ambiguous if it is susceptible to more than one reasonable interpretation or its meaning is simply uncertain. *Knopf v. Gray*, 545 S.W.3d 542, 545 (Tex. 2018); *Hunt*, 597 S.W.3d at 916. Whether a will is ambiguous is a question of law. *Hunt*, 597 S.W.3d at 916. A will is not ambiguous merely because the parties disagree as to its meaning. *See Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) (interpreting contract). If, however, after applying the pertinent rules of construction, the language is subject to two or more reasonable

15

interpretations, then the will is ambiguous and creates a fact issue over the testator's intent. *See El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 806 (Tex. 2012) (interpreting contract). If a will is not ambiguous, then courts must interpret it as a matter of law. *Hunt*, 597 S.W.3d at 916.

The 2016 codicil, which is written in an open space under the second self-proving affidavit of the 2001 will, refers to "*This* Will" (emphasis added). "This" refers to "the person, thing, or idea that is present or near in place, time, or thought or that has just been mentioned." *This*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2014). Because the 2016 codicil was written on the 2001 will, the 2001 will was "present," meaning that the codicil's use of "This Will" is reasonably understood as referring to the 2001 will. *See In re Estate of Hendler*, 316 S.W.3d 703, 711 (Tex. App.—Dallas 2010, no pet.) (fact that note was written on page of will constituted evidence that note was made in reference to that will). Daniel does not propose a different reasonable interpretation. We conclude that the 2016 codicil contains an unambiguous and sufficient reference to the 2001 will, and thereby revives that will as of the date of the codicil. *See Hinson*, 280 S.W.2d at 735.

Daniel also faults the trial court for concluding that the 2016 codicil revoked the 2005 will because, unlike the 2005 will, which expressly revokes the 2001 will, the codicil lacks express language revoking the 2005 will. But "[a] will need not

16

contain an express revocation clause in order to revoke a prior one." *In re Estate of Setser*, No. 01-15-00855-CV, 2017 WL 444452, at *3 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (mem. op.). If a will makes a contrary disposition of the entire estate, it impliedly revokes a prior validly executed will. *Id*.

In his 2005 will, Billy Joe left all his property, except for a $25.00 bequest to each of his children, to Daniel or her son. In his 2001 will, Billy Joe left all his property to his children. Because the disposition of the 2005 will was contrary to that in the 2001 will, the trial court properly concluded that the 2016 codicil, which revived the 2001 will, impliedly revoked the 2005 will. Accordingly, we hold that the trial court did not err in admitting the 2016 codicil, which revoked the 2005 will, and the 2001 will to probate.

We overrule Daniel's first and second issues.

In her third issue, Daniel asserts that the trial court erred in finding that the 2016 codicil was written by Billy Joe entirely in his own handwriting and with the testamentary intent to revive the 2001 will. According to Daniel, the trial court disregarded evidence that Billy Joe did not execute the handwritten codicil. In making her assertion, Daniel relies on Carlson's testimony that the signature on the 2016 codicil was written by a different person than the person who signed the thirty-six samples of Billy Joe's handwriting and signature that Carlson had been given.

But the trial court did not disregard Carlson's testimony. In its findings of fact, the trial court expressly noted that "one expert witness testified that in her opinion the handwriting was not that of Billy Joe . . . ." It also found that "[f]our witnesses, including the notary, testified that they either saw [Billy Joe] write the statement or saw him writing something on the [2001 will]." As the fact finder, the trial court was not required to accept Carlson's testimony over other witnesses' contrary testimony in resolving the dispute over whether the 2016 codicil bears Billy Joe's signature. *See In re Estate of Cornes*, 175 S.W.3d 491, 497 (Tex. App.—Beaumont 2005, no pet.) (opinion testimony of questioned-documents examiner presented fact issue about author of writing); *see also City of Keller*, 168 S.W.3d at 820 ("Even uncontroverted expert testimony does not bind [the fact finder] unless the subject matter is one for experts alone."). A layperson who is familiar with a person's handwriting may properly authenticate a writing. *See* TEX. R. EVID. 901(b)(2); *Austin v. Austin*, No. 03-18-00678-CV, 2019 WL 4309569, at *3 n.4 (Tex. App.—Austin Sept. 12, 2019, no pet.) (mem. op.). And Carlson testified that a person's signature could change depending on his age, health, and emotional state. The trial court also heard testimony that Billy Joe appeared "maybe a little agitated," he had just come from working in a hayfield, the weather was hot, his pen was not working properly, and he was "griping" about the pen. The record supports the trial

court's resolution of the disputed evidence on this issue. *See McKeehan*, 554 S.W.3d at 698.

Daniel also asserts that the trial court made its findings supporting the admission of the 2016 codicil and 2001 will to probate even though "not a single disinterested witness testified as to the execution or intent of the handwritten notation alleged to be in [Billy Joe's] handwriting." But the Texas Estates Code does not require two disinterested witnesses to prove a holographic will; it "may be proved by two witnesses to the testator's handwriting," regardless of their interest. *In re Dillard*, No. 06-08-00015-CV, 2008 WL 4411717, at *2 (Tex. App.—Texarkana Sept. 30, 2008, pet. denied) (mem. op.) (observing former Texas Probate Code section 84(c), recodified as Texas Estates Code section 256.154, "requires two witnesses to identify the handwriting of the testator; it does not require two *disinterested* witnesses"); *see* TEX. EST. CODE ANN. § 256.154.[2] And, contrary to Daniel's assertion, the trial court did hear testimony about the codicil's execution from two witnesses who were not devisees under the will: Miller, the notary public, who witnessed Billy Joe write and sign the 2016 codicil and heard him say, "This is

---

[2] Daniel relies on Texas Estates Code section 254.002, which applies to subscribing witnesses. That section does not apply to holographic wills or codicils, which do not require subscribing witnesses. *See* TEX. EST. CODE ANN. § 254.002 (subscribing witness who is devisee and testifies in proving will must either forfeit bequest or have testimony "corroborated by at least one disinterested and credible person who testifies that the subscribing witness's testimony is true and correct").

the one I want to use," and Pamela, the wife of Billy Joe's son, who saw Billy Joe writing the 2016 codicil from a distance and testified that she recognized the signature on it as that of Billy Joe. (Internal quotations omitted.)

The trial court, as the fact finder, properly exercised its discretion in resolving any conflicts in the evidence about the authenticity of the signature on the 2016 codicil. Thus, we hold that the trial court did not err in finding that Billy Joe executed the 2016 codicil and admitting the 2016 codicil and 2001 will to probate.

We overrule Daniel's third issue.

## Conclusion

We affirm the order of the trial court.


Julie Countiss
Justice

Panel consists of Justices Kelly, Goodman, and Countiss.