# NO. 12-14-00117-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *AMERICAN DREAM TEAM, INC.,* *APPELLANT* | § | *APPEAL FROM THE 173RD* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *CITIZENS STATE BANK,* *APPELLEE* | § | *HENDERSON COUNTY, TEXAS* |

### *OPINION*

American Dream Team, Inc. filed a motion for rehearing of our September 16, 2015 opinion. We overrule the motion for rehearing, withdraw our opinion and judgment of September 16, 2015, and substitute the following opinion and corresponding judgment in their place.

American Dream Team, Inc. (ADT) filed suit against Citizens State Bank alleging the Bank had improperly charged back $30,000.00 against its account for a provisional credit extended on a counterfeit check. The trial court granted the Bank's motion for traditional and no evidence summary judgment, rendering a take nothing judgment on all of ADT's claims, and awarding attorney's fees to the Bank. In six issues, ADT contends the trial court reversibly erred. We affirm.

### BACKGROUND

ADT is a real estate brokerage firm specializing in selling properties in the Cedar Creek Lake area of Henderson County, Texas. On January 23, 2010, it received the following system wide email sent by the marketer Point2 Real Estate:

Prospect Email

You are receiving this email because Mr. Yang Hua Lopez has emailed you from your website.

Email:    yanghl@informaticos.com

Dear Sir/Madam, I am Mr. Yang Hua Lopez currently the Chief Financial Officer (CFO) Hangzhou Iron & Steel Group Company (HISGC) Website: http://www.hazsteel.com I am retiring soon will be relocating to Texas for Good, after searching the Internet for a reliable real estate agent I found your firm have decided to choose your firm to buy my permanent home. The home will be a cash buy and I will fly to your city for viewing the property but before that I would like my stock broker in America to send the money to your firm via a lawyer/solicitor to keep in a trust account upon arrival. I need a 4 bed rooms/5 bed room's home of $300,000.00USD - $1,200,000.00USD In nice neighborhood in your city and state. Email is better than telephone due to my accent and english. Regards, Mr. Yang Hua Lopez Chief Financial Officer, Email; yanghl@informaticos.com

Manage Prospect – Mr. Yang Hua Lopez

The following day, Trena Davis, a real estate agent with ADT, responded to Lopez by email stating that she would be happy to assist him in his home search. Upon his request, she sent him more than ten prospective properties meeting his stated requirements. Within an hour and a half, Lopez chose what he described as his "dream home" in Lewisville, Texas, more than eighty miles away from Cedar Creek Lake. Davis then sent Lopez a buyer's representation agreement, which she requested he sign and return to her. On January 27, Lopez sent Davis the following email:

Dear Trena,

I would like to inform you that my stock broker has sent you a payment of $105,000.00USD ($500,000.00USD) will be down payment of the property the rest will be completed upon my arrival and ($98,000.00USD) will be for the purchacse [sic] of Chinese home style furniture, Chinese style home entertainment, Chinese home decoration and Chinese kitchen appliance in China.

Please update me once you receive the payment.

Regards,
Mr. Yang Hua Lopez
Chief Financial Officer
Hangzhou Iron & Steel Group Company
Banshan County, Gongshu Dct,
Hangzhou Zhejiang 310022 China.
Tel: +86 10868 99249
Email: yanghua@ejecutivos.com
Website: http://www.hazsteel.com

On February 8, Davis emailed Lopez that she had not received the funds that had purportedly been sent January 27. Nor had she received the buyer's representation agreement from Lopez. In response, Lopez sent Davis the following email:

From:    yanghl@informaticos.com

Sent:    Wednesday, February 10, 2010 8:13 AM
To:    trena.davis@coldwellbankeradr.com

Subject: Dear Trena (update)

Dear Trena

I would like to inform you that my stock broker firm has sent you a new payment of $35,000 via UPS ($5000.00USD) will be the down payment of the property the balance will be completed upon my arrival and ($30,000.00USD) will be for the purchacse [sic] of Chinese home style furniture, Chinese home style entertainment, Chinese home decoration and Chinese kitchen appliance in China.

You will receive it today via ups, update me once you receive it, have a nice day.

Regards,
Mr. Yang Hua Lopez
Chief Financial Officer.

On the same day, ADT received a check from a "Mr. Green Sound," identifying himself as Mr. Lopez's account manager. The check had two different amounts on its face. In numerals, it stated "$35,000.00USD," and in writing, it stated "THIRTY THOUSAND AND 00/100 US DOLLARS." The check's drawer was AXA Insurance Company of Canada with the payer bank being the Bank of Montreal in Toronto, Ontario.

Jan Payne, ADT's president, filled out a deposit slip in the amount of $35,000.00 for deposit into ADT's escrow account at the Bank. On February 11, ADT's vice president, Robert Blaase, was told by the branch manager, Leland Pitts, and a Bank employee, Heather McDougald, that because the check was drawn on a foreign bank, it could take between one and two months for the funds to be collected. McDougald prepared a "foreign check transmittal form." It showed that following Blaase's instructions, ADT was given a provisional credit for the check, pending collection. Blaase had been given a second option to send the check for collection with a minimum $75.00 fee plus possible additional fees from the paying bank, the Bank of Montreal. Taking the second option would have meant that ADT would not receive the

provisional credit. But because Blaase chose the option to receive the provisional credit, the funds were immediately available for ADT's use under its deposit and related agreements with the Bank.

On March 1, Payne was told by McDougald, after she had looked on her computer, that "the funds were there" and "it looks like they're good." On March 2, Blaase told Bank teller Laura Hill at the Bank's Mabank branch that he wanted to wire $30,000.00 to a bank in Japan. Before sending the wire, he told Hill that he wanted to make sure that the AXA Insurance Company check had cleared. He testified that she looked at her computer screen and said "yes." The money was wired to Tokyo that day.

On March 15, the Bank and ADT were notified the check was counterfeit. Attempts were made to recover the $30,000.00 wired to the Tokyo bank, but to no avail. The Bank then made a chargeback against ADT's escrow account for $30,000.00.

ADT later filed suit against the Bank to recover the $30,000.00 chargeback based on the following legal theories:

1. Negligent misrepresentation and conversion;
2. Violations of the Deceptive Trade Practices Act (DTPA);
3. Common law fraud;
4. Breach of contract (the deposit agreement), equitable estoppel, and failure to return check;
5. Money had and received; and
6. Promissory estoppel.

The Bank counterclaimed against ADT for its breach of transfer warranties on the counterfeit check and for its attorney's fees pursuant to the deposit agreement. The Bank filed a motion for traditional and no evidence summary judgment asserting that certain claims are barred by limitations, that ADT's fraud claim is preempted by the Uniform Commercial Code (UCC), and that there is no evidence to support ADT's common law causes of action. The Bank also moved for summary judgment on its counterclaim for breach of warranties under the UCC and for attorney's fees. The court rendered judgment that ADT take nothing on its claims

4

against the Bank and awarded the Bank $72,938.00 in attorney's fees against ADT. This appeal followed.

## VOLUMINOUS RECORDS

In its first issue, ADT contends that the trial court erred in striking much of the deposition testimony of Janet Payne, Robert Blaase, Leland Pitts, and Heather McDougald. In response to the Bank's objection, the trial court struck all deposition testimony that was not specifically referenced in ADT's response to the Bank's motion for summary judgment. ADT argues that the depositions were not voluminous and, in light of today's technology, searching for words can be done electronically.

Rulings concerning the admission or exclusion of summary judgment evidence are reviewed under an abuse of discretion standard. *Barraza v. Eureka Co*., 25 S.W.3d 225, 228 (Tex. App.—El Paso 2000, pet. denied). A trial court abuses its discretion if it acts without any reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc*., 701 S.W.2d 238, 241 (Tex. 1985).

A general reference to a voluminous summary judgment record is inadequate to meet the evidentiary burden in a summary judgment. *Ramirez v. Colonial Freight Warehouse Co.*, 434 S.W.3d 244, 250 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). An appellant has a duty to show that the record supports its contentions. *Blake v. Intco Invs. of Tex., Inc.*, 123 S.W.3d 521, 525 (Tex. App.—San Antonio 2003, no pet.). Here, ADT made reference to portions of three of the four depositions to support its position on the summary judgment. ADT did not, in its response, specify any page or line of Blaase's deposition that it was relying on. However, it attached each of the four depositions in its entirety. The trial court should not be compelled to sift through hundreds of pages of depositions to search for evidence supporting a summary judgment contestant's contentions. *Guthrie v. Suiter*, 934 S.W.2d 820, 826 (Tex. App.—Houston [1st Dist.] 1996, no writ.). Therefore, the trial court did not abuse its discretion by refusing to allow ADT to rely on Blaase's deposition testimony or the portions of the depositions of Payne, McDougald, and Pitts that were not specifically cited to it in ADT's summary judgment response. We overrule ADT's first issue.

The Bank filed a combined traditional and no evidence motion for summary judgment. It argued entitlement to judgment as a matter of law on each of ADT's causes of action as well as the Bank's counterclaim.

**Standard of Review**

A party moving for traditional summary judgment bears the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c). A defendant who conclusively negates at least one of the essential elements of the cause of action or conclusively establishes an affirmative defense is entitled to summary judgment. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010). Once the defendant establishes its right to summary judgment as a matter of law, the burden shifts to the plaintiff to present evidence raising a genuine issue of material fact. *Simulis, L.L.C. v. Gen. Elec. Capital Corp.*, 439 S.W.3d 571, 575 (Tex. App.—Houston [14th Dist.] 2014, no pet.). To determine if there is a fact issue, we review the evidence in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could do so, and disregarding contrary evidence unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). The evidence raises a genuine issue of fact if reasonable and fair minded jurors could differ in their conclusions in light of all the summary judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007).

**Propriety of Traditional Summary Judgment**

In its fifth issue, addressing its numerous theories, ADT contends that the bank improperly charged back its provisional credit for the counterfeit check in the amount of $30,000.00. Therefore, it contends, the trial court erred in granting the Bank's motion for traditional summary judgment. ADT further asserts that the trial court erred in granting summary judgment in favor of the Bank on its counterclaim for ADT's breach of UCC warranties.

**Breach of Contract**

ADT alleged that the Bank's withdrawal of funds from ADT's account was a breach of the deposit agreement and the Bank breached its common law duty to perform. The relationship

of a bank to a general depositor is contractual, that of debtor-creditor arising from the depository contract. ***Trevino & Assocs. Mech., L.P. v. Frost Nat'l Bank***, 400 S.W.3d 139, 148 (Tex. App.—Dallas 2013, no pet.). The laws of this state govern a deposit contract between a bank and a consumer account holder if the branch or separate office of the bank that accepts the deposit contract is located in Texas. TEX. BUS. & COM. CODE ANN. § 4.102(c) (West Supp. 2015). Under the laws of this state, the UCC regulates a bank's handling of deposits and collections for its customers. TEX. BUS. & COM. CODE ANN. §§ 4.101-.504 (West 2002 & Supp. 2015). The relationship may also be governed in part by agreements between the bank and its customer. ***Contractors Source, Inc. v. Amegy Bank Nat'l Ass'n***, 462 S.W.3d 128, 133 (Tex. App.—Houston [1st Dist.] 2015, no pet.). The UCC, in these relationships, contains a comprehensive and carefully considered allocation of responsibility among parties to banking relationships. ***Sw. Bank v. Info. Support***, 149 S.W.3d 104, 107 (Tex. 2004); ***Am. Airlines Emps. Fed. Credit Union v. Martin***, 29 S.W.3d 86, 91 (Tex. 2000). Where the UCC applies, common law rules regarding breach of contract do not apply. ***Plano Lincoln Mercury, Inc. v. Roberts***, 167 S.W.3d 616, 624 (Tex. App.−Dallas 2005, no pet.). Further, when the UCC applies, common law claims that conflict with the UCC are precluded. *See **Contractors Source, Inc***., 462 S.W.3d at 138.

In a chargeback such as happened here, Section 4.214 of the UCC applies. TEX. BUS. & COM. CODE ANN. § 4.214(a). Any cause of action that ADT had for breach of contract was preempted by the UCC. ***Roberts***, 167 S.W.3d at 624. When the Canadian check was determined to be counterfeit, the Bank was authorized by the UCC to effectuate a chargeback. TEX. BUS. & COM. CODE ANN. § 4.214(a). The chargeback would have also been allowed by the deposit agreement. The trial court did not err by granting the Bank a summary judgment on ADT's breach of contract claim. *See **Fernandez***, 315 S.W.3d at 508.

## Equitable Estoppel

ADT asserted that the Bank is estoped to deny that ADT was informed the check had cleared or was good. The doctrine of equitable estoppel requires (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted upon; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations. ***Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.***, 962 S.W.2d 507, 515-16 (Tex. 1998).

7

The first element of equitable estoppel required a false statement to ADT by McDougald or Hill. As explained more fully below, when McDougald and Hill respectively spoke to Payne and Blaase, they reported information on ADT's account as provided by the Bank's computer system. The uncontroverted evidence is that the funds were in ADT's account due to the provisional credit Blaase had opted for. Neither McDougald nor Hill made a false statement. Therefore, this defense fails. *See Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).

## Failure to Return Check

In its petition, ADT complained that its claim against the maker of the check is precluded due to the Bank's failure to return the alleged counterfeit check. In its brief, ADT has not argued and analyzed its position on the Bank's failure to return the check. Further, it has not cited any authority to support its position. Rule 38 of the Rules of Appellate Procedure provides that a brief to the court of appeals shall contain, among other things, "a clear and concise argument for the contentions made, with appropriate citations to authorities in the record." TEX. R. APP. P. 38.1(i); *In re B.A.B.*, 124 S.W.3d 417, 420 (Tex. App.—Dallas 2004, no pet.). The failure to adequately brief an issue, either by failing to specifically argue and analyze one's position or provide citations to authorities, waives any error on appeal. *Id.* Therefore, ADT has waived any error regarding this cause of action.

## Promissory Estoppel

ADT alleged that the Bank consented to inform ADT if the check was not good and was damaged when it relied on Bank employees' statements that the check was good. The requisites of promissory estoppel are (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promisee to his detriment. *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 686 n.25 (Tex. 2002). If an alleged promise is part of a valid contract, the promisee cannot disregard the contract and sue for reliance damages under the doctrine of promissory estoppel. *BP Am. Prod. Co. v. Zaffirini*, 419 S.W.3d 485, 507 (Tex. App.—San Antonio 2013, pet. denied). Promissory estoppel is not applicable to a promise covered by a valid contract between the parties. *Id*.

As explained above, there was a valid contract between the Bank and ADT with regard to deposits and collections. Therefore, even if this contract was not preempted by the provisions of the UCC related to chargeback on provisional credits, a promissory estoppel cause of action

8

would not have been available to ADT in this case. *See id*. The trial court did not err in granting the Bank's motion for summary judgment on ADT's claim for promissory estoppel. *See Fernandez*, 315 S.W.3d at 508.

## Money Had and Received

ADT alleged that the Bank wrongfully withdrew $30,000.00 from ADT's account and it would be unconscionable for the Bank to retain it. To recover in a cause of action for money had and received, all a plaintiff need show is that the defendant holds money that in equity and good conscience belongs to the plaintiff. *Staats v. Miller*, 243 S.W.2d 686, 687 (Tex. 1951). This cause of action "looks solely to the inquiry, whether the defendant holds money which belongs to the plaintiff." *Id.* at 687-88. Money had and received is a common law claim.[1] It is not listed as a cause of action that supplements the UCC. *See* TEX. BUS. & COM. CODE ANN. § 1.103(b). Furthermore, the Bank withdrew the $30,000.00 pursuant to Section 4.214 of the UCC, which gives the Bank the right to charge back the amount previously given for a dishonored item. TEX. BUS. & COM. CODE ANN. § 4.214. Therefore, the common law cause of action for money had and received has been supplanted by Chapter 4 of the UCC. The trial court properly granted summary judgment in favor of the Bank on ADT's claim for money had and received. *See Fernandez*, 315 S.W.3d at 508.

## Negligent Misrepresentation and Conversion

ADT alleged that the Bank's actions constituted negligent misrepresentation and conversion. Causes of action for negligent misrepresentation and conversion must be filed within two years from the date that they occur. If not, the claim is barred by the statute of limitations. TEX. CIV. PRAC. & REM. CODE ANN. § 16.003 (West Supp. 2015); *Tex. Am. Corp. v. Woodbridge Joint Venture*, 809 S.W.2d 299, 303 (Tex. App.—Fort Worth 1991, writ denied).

Here, the alleged negligent misrepresentation and conversion would have occurred in March 2010. ADT filed its first original petition against the Bank in September 2012. This was more than two years after ADT's cause of action would have accrued, and the negligent misrepresentation and conversion causes of action are therefore barred by the statute of limitations. The trial court did not err in granting summary judgment in favor of the Bank on ADT's negligent misrepresentation and conversion claims. *See Fernandez*, 315 S.W.3d at 508.

---

[1] At common law, this cause of action was known as assumpsit. Michol O'Connor, O'CONNOR'S TEXAS CAUSES OF ACTION 131 (2015).

**Deceptive Trade Practices Act**

Any cause of action filed under the DTPA must be brought within two years after discovery of the deceptive act complained of. TEX. BUS. & COM. CODE ANN. § 17.565 (West 2011). Again, this cause of action would have accrued in March 2010 and suit was not filed until September 2012. ADT's DTPA cause of action is barred by the statute of limitations. *Id*. The trial court did not err in granting summary judgment in favor of the Bank on ADT's DTPA cause of action. *See Fernandez*, 315 S.W.3d at 508.

**The Bank's Counterclaim**

The Bank counterclaimed for ADT's breach of warranties under UCC Sections 3.416 and 4.207. *See* TEX. BUS. & COM. CODE ANN. §§ 3.416, 4.207 (West Supp. 2015). Pursuant to those sections, ADT warranted that it was entitled to enforce the check sent by Lopez and that the signature on the check was authentic. *Id*.

ADT argues that the warranties apply only to checks that are deposited, not those sent for collection. The UCC does not make that distinction regarding warranties. The UCC provides that when a person transfers an instrument for consideration, he provides certain warranties. *Id*. An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument. TEX. BUS. & COM. CODE ANN. § 3.203 (West 2002).

ADT further asserts that Sections 3.416 and 4.207 apply to negotiable instruments and a counterfeit check is not negotiable, but only a facsimile of a negotiable instrument. Again, this is not an accurate distinction. Classification of an item as a negotiable instrument is based on form. TEX. BUS. & COM. CODE ANN. § 3.104(f) (West Supp. 2015). The evidence shows that the check at issue was counterfeit. Therefore, ADT breached its warranty that all signatures on the instrument are authentic and that it was entitled to enforce the check. *See* TEX. BUS. & COM. CODE ANN. §§ 3.416, 4.207. Accordingly, the trial court did not err in granting summary judgment in favor of the Bank on its counterclaim for breach of warranties under the UCC. *See* TEX. R. CIV. P. 166a(c).

**Summation**

ADT has not shown error in the trial court's determination that the Bank is entitled to summary judgment on each of these specified causes of action, ADT's defense of equitable estoppel, or on the Bank's counterclaim. Accordingly, we overrule ADT's fifth issue.

10

**Chapter 4 Preemption**

In its second issue, ADT contends that the trial court erred in granting summary judgment on the Bank's preemption defense. ADT asserts that its fraud claim, which was based on the statements made by the Bank's two employees during the check settlement process, was not preempted by the Uniform Commercial Code.

Chapter 4 of the UCC establishes the rights and duties between banks and their customers regarding deposits and collections. TEX. BUS. & COM. CODE ANN. §§ 4.101-.504; *Martin*, 29 S.W.3d at 91. Whether Chapter 4 applies is a question of law, which we review de novo. *Id*. To the extent they do not conflict with the UCC's provisions, common law principles complement the UCC. *Roberts*, 167 S.W.3d at 624. Principles of law and equity, including fraud and misrepresentation, supplement the provisions of the UCC unless displaced by particular UCC provisions. *See* TEX. BUS. & COM. CODE ANN. § 1.103(b) (West 2009). Additionally, Official Comment 2, Section 1.103 provides further guidance as follows:

> The Uniform Commercial Code was drafted against the backdrop of existing bodies of law, including the common law and equity, and relies on those bodies of law to supplement it [sic] provisions in many important ways. At the same time, the Uniform Commercial Code is the primary source of commercial law rules in areas that it governs, and its rules represent choices made by its drafters and the enacting legislatures about the appropriate policies to be furthered in the transactions it covers. Therefore, while principles of common law and equity may *supplement* provisions of the Uniform Commercial Code, they may not be used to *supplant* its provisions, or the purposes and policies those provisions reflect, unless a specific provision of the Uniform Commercial Code provides otherwise.

TEX. BUS. & COM. CODE ANN. § 1.103 cmt. 2. Thus, a common law cause of action can continue in a commercial law context in Texas when it does not conflict with provisions of the UCC. *See Bryan v. Citizens Nat'l Bank in Abilene*, 628 S.W.2d 761, 764 (Tex. 1982).

Relevant to the facts of this case, Section 4.214(a) of the UCC states in pertinent part that

> (a) [i]f a collecting bank has made provisional settlement with its customer for an item and fails by reason of dishonor, suspension of payments by a bank, or otherwise to receive settlement for the item that is or becomes final, the bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account, or obtain refund from its customer, whether or not it is able to return the item, if by its midnight deadline or within a longer reasonable time after it learns the facts it returns the item or sends notification of the facts.

TEX. BUS. & COM. CODE ANN. § 4.214(a). Customers who are victims of fraudulent transactions often pursue common law causes of action to avoid the bank's right of chargeback as provided by the code. Melissa Waite, *Check Fraud and the Common Law: At the Intersection of Negligence and the Uniform Commercial Code*, 54 B. C. L. Rev. 2205, 2224 (Nov. 2013). "[The UCC] is not clear as to whether and under what contexts common law claims should be allowed in check fraud scenarios because Articles 3 and 4 have no explicit preemption provision." *Id*.

When construing a statute, we are to consider, among other things, the object to be obtained by the legislature and the circumstances under which the statute was enacted. TEX. GOV'T CODE ANN. § 311.023 (1), (2) (West 2013). The UCC contains a comprehensive and carefully considered allocation of responsibility among parties to a banking relationship in Texas. *Sw. Bank*, 149 S.W.3d at 107. Chapter 4 of the UCC specifies duties and responsibilities for a bank in the actual check processing procedure. But, it is silent about the bank's communications with the customer during the check processing procedure. The Montana Supreme Court, in an opinion involving a similar fact pattern, determined that common law principles apply when a bank communicates with a depositor who has inquired about the check processing procedure. *See Valley Bank of Ronan v. Hughes*, 147 P.3d 185, 191 (Sup. Ct. Mont. 2006).

In that case, the customer alleged that the bank had made misrepresentations about the check settlement process. He then sued the bank claiming that it had inappropriately charged back his account after the dishonor of the deposited checks. The Montana Supreme Court reasoned that because such communications are not addressed with specificity by the UCC, common law and equitable principles supplement the UCC and govern the legal rights and responsibilities that applied to the bank's representations to the customer, upon which the customer allegedly relied. *Id*. The Montana Supreme Court thus held that common law principles apply to bank communications to a depositor inquiring about the processing of checks. *Id*. at 192.

We are mindful that a uniform act included in a code shall be construed to effect its general purpose to make uniform the law of those states that enact it. TEX. GOV'T CODE ANN. § 311.028 (West 2013). The UCC itself specifically describes fraud as a cause of action that can be used to supplement its provisions. TEX. BUS. & COM. CODE ANN. § 1.103. We therefore agree with the Montana Supreme Court's holding in *Valley Bank of Ronan v. Hughes* that

common law fraud principles apply to bank communications during the check processing procedure. Accordingly, the trial court erred in granting summary judgment on the Bank's affirmative defense of preemption as asserted against ADT's fraud claim. *See Fernandez*, 315 S.W.3d at 508. We sustain ADT's second issue.

## NO EVIDENCE MOTION FOR SUMMARY JUDGMENT

The Bank moved for summary judgment on ADT's common law fraud cause of action on traditional and no evidence grounds, which ADT attacks in its third and sixth issues respectively. Under these circumstances, we first review the propriety of the summary judgment under the no evidence standard. *See Merriman*, 407 S.W.3d at 248. In its no evidence motion, the Bank contended that there is no evidence that it made a false representation or that any representation was made with knowledge of its falsity or recklessly, and no evidence that ADT could reasonably or justifiably rely on the alleged representation. In its sixth issue, ADT contends that it produced more than a scintilla of evidence related to its fraud claim, thereby defeating the Bank's motion for a no evidence summary judgment on that claim. ADT claims it produced more than a scintilla of evidence raising fact questions as to whether false representations were made intentionally and without knowledge of the truth, and whether ADT reasonably relied on a representation by the Bank.

### Standard of Review

We review the trial court's decision to grant summary judgment de novo. *Tex. Mun. Power Agency v. Pub. Util. Comm'n*, 253 S.W.3d 184, 192 (Tex. 2007). After adequate time for discovery, a party without the burden of proof at trial may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense. TEX. R. CIV. P. 166a(i). Once a no evidence motion has been filed in accordance with Rule 166a(i), the burden shifts to the nonmovant to bring forth evidence that raises a fact issue on the challenged element. *See Macias v. Fiesta Mart, Inc.*, 988 S.W.2d 316, 317 (Tex. App.—Houston [1st Dist.] 1999, no pet.). A no evidence summary judgment is essentially a pretrial directed verdict and is therefore reviewed by the same legal sufficiency standard applicable to a directed verdict. *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009). The entire record must be reviewed in the light most favorable to the nonmovant, crediting evidence favorable to that party if reasonable jurors could, and disregarding contrary evidence and

13

inferences unless reasonable jurors could not. *Ramirez v. Gonzalez*, 463 S.W.3d 499, 504 (Tex. 2015); *Merriman*, 407 S.W.3d at 248. A no evidence challenge will be sustained when

> (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact.

*Merriman*, 407 S.W.3d at 248. More than a scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair minded jurors to differ in their conclusions. *Wal-Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex. 2006); *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172 (Tex. 2003). The motion must specifically state the elements for which there is no evidence. *Salazar v. Ramos*, 361 S.W.3d 739, 745 (Tex. App.— El Paso 2012, pet. denied).

## Elements of Fraud

A plaintiff, such as ADT, seeking to prevail on a fraud claim must prove that (1) the defendant made a material misrepresentation; (2) the defendant knew the representation was false or made the representation recklessly without any knowledge of its truth; (3) the defendant made the representation with the intent that the other party would act on that representation or intended to induce the party's reliance on the representation; and (4) the plaintiff suffered an injury by actively and justifiably relying on that representation. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 217 (Tex. 2011).

## Material Misrepresentation

ADT claims that the summary judgment evidence raises a fact issue regarding whether Bank employees Heather McDougald and Laura Hill made material misrepresentations or false statements to Payne and Blaase. ADT asserts that both tellers indicated that the check had cleared although it was later determined that the check was counterfeit. Early in her deposition testimony, Payne stated that, on March 1, McDougald told her "that the check had cleared." Later in the deposition, she again recounted that conversation more specifically:

> A.  I asked her when I was in. I made deposits on the 1st of March. I had three deposits that day, and so - - and that was a Monday, and I asked Heather, and she said, Let me look on the computer, and she told me then that the funds were there, and she said, it looks like they're good.

Q. Did she say anything other than that?
A. I don't remember.
Q. Tell me as close as you can precisely what she said. The funds were there?
A. I did ask her, I said, Then can I disburse the funds? And she said, Yes. That was the other thing.
Q. You asked her, Can I disburse the funds?
A. Yes.
Q. And then she said yes. And what else - - what else did she say besides yes to that question?
A. Nothing, that I can - -
Q. So the only thing that she said in response to your question, Can I disburse the funds, and she said yes?
A. Said yes.
Q. And that's all she said?
A. Yes, as far as my recollection, that's what she said.
Q. Okay. And do you now believe that she was in error when she said that?
A. I think she believed it, but evidently it wasn't correct.
Q. She obviously wasn't trying to deceive you in some way, was she?
A. No, I don't think she was trying to deceive me.

Similarly, ADT contends Hill also misrepresented the status of the check when Blaase inquired. According to Blaase's deposition testimony, he told her he wanted to make sure "this check" had cleared. He testified that she briefly looked at her computer screen "and said yes."

Reviewing this evidence in the light most favorable to ADT, and in isolation, the evidence appears to raise a fact question as to whether McDougald and Hill made false statements that the check had cleared when it had not. However, we are to review the entire record and, at times, consider "contrary evidence." *See City of Keller v. Wilson*, 168 S.W.3d 802, 811-12 (Tex. 2005). Here, it is essential to consider the comments in light of the context surrounding what each teller read on her computer screen. To clarify her testimony that McDougald said the check had cleared, Payne explained that McDougald told Payne "the funds were there." Then McDougald said, "It looks like they are good." Payne further testified that McDougald told her that she could disburse the funds.

As a customer of the Bank, ADT was subject to the terms of a deposit agreement. The deposit agreement provides that, in accepting items for deposit, the Bank assumes no responsibilities beyond the exercise of ordinary care. Further, the agreement provides that all checks credited to an account are subject to receipt of the proceeds of final payment by the Bank. The Bank's policy is to make funds from the depositor's cash and check deposits available to the depositor on the first business day after the day it receives the deposit.

15

Leland Pitts, in his deposition testimony, clarified that the check was not deposited in ADT's account. It was sent for collection to Texas Independent Bank for further presentation to the Montreal bank for final settlement. The Bank's money was deposited in ADT's account as a provisional credit pending final settlement of the check. The tellers' computer screen would have shown the provisional credit that ADT had received pursuant to the deposit agreement and the Bank's funds availability policy. The tellers' answers were based on what they saw on their computer screen. The Bank's computer showed the availability of the funds and this was reported to Payne and Blaase. Thus, under the deposit agreement and funds availability policy, the statements made by McDougald and Hill were true. Funds were in the account, they were good, and ADT could immediately disburse the funds. Accordingly, the Bank's contextual evidence transformed ADT's proof, which if viewed in isolation and in a light most favorable to ADT would appear to raise a fact issue, into no evidence. The Bank's proof supplied the context negating the probative force of ADT's proof. *See* Timothy Patton, SUMMARY JUDGMENTS IN TEXAS, PRACTICE, PROCEDURE AND REVIEW § 8.06[5][d] (3d ed. 2015). Accordingly, there is no evidence of the false representation element of ADT's cause of action for fraudulent misrepresentation.

**Knowing or Reckless Misrepresentation**

ADT contends that there is evidence raising a fact question on whether McDougald and Hill knew their statements were false or if the statements were made recklessly without knowledge of the truth. As explained above, there is no evidence that the tellers' statements were false. It follows that there can be no evidence that they knew their statements were false. Moreover, contextual evidence shows that the check was not determined to be counterfeit until two weeks after McDougald and Hill made their complained-of comments. Therefore, they did not knowingly represent that a counterfeit check had cleared. Furthermore, Payne testified that she did not think that anyone at the bank intended to deceive or mislead her. Payne thought they just made a mistake. Likewise, Blaase testified that he did not think that Hill was lying or trying to deceive him. This constitutes an admission that the tellers did not knowingly make a false statement. Thus, there is no evidence that the Bank knowingly made a false statement. *See City of Keller*, 168 S.W.3d at 815.

A speaker acts recklessly if she makes representations "without any knowledge of the truth and as a positive assertion." *Kenneco Energy, Inc.*, 962 S.W.2d. at 527. A representation

is recklessly made if the speaker knows that he does not have sufficient information or basis to support it. *Id*. Here, McDougald, based on ADT's account records as accessed through the Bank's computer, truthfully stated that funds were available. Although it was later determined that the check was counterfeit, to raise a question of recklessness, there must be more evidence than merely that the person making the representation turned out to be wrong. *See Landers v. Aurora Loan Servs., LLC*, 434 S.W.3d 291, 297 (Tex. App.—Texarkana 2014, no pet.). Furthermore, Blaase testified that he did not explain to Hill that he wanted to make sure a check drawn on an account in a foreign country had cleared. He gave her no background information so she had no information suggesting the need to further investigate. Fraud requires proof of an affirmative misrepresentation, not simply a misunderstanding. *See Mumphord v. First Victoria Nat'l Bank*, 605 S.W.2d 701, 704 (Tex. App.—Corpus Christi 1980, no writ). Accordingly, there is no evidence that the Bank's representatives made any representation recklessly.

**Justifiable Reliance**

In its motion, the Bank asserted that there is no evidence that ADT reasonably relied on the claimed representation. ADT's response to the motion does not identify summary judgment evidence raising a fact issue on justifiable reliance. In its brief, ADT contends "[t]here was no justifiable reason for [it] not to rely on the representations by the Bank's tellers, the most logical and best choice available to it." Thus, it appears that ADT asserts that the Bank failed to show entitlement to a summary judgment denying ADT's fraud claim. We consider the entire record, disregarding evidence that is not favorable to ADT unless a reasonable juror could not disregard it. *See Gish*, 286 S.W.3d at 310.

Blaase asserted that he was relying on what Hill viewed on her computer screen to determine that the check had cleared. The record shows that he had asked the Bank's vice president and branch manager in Gun Barrel City, Leland Pitts, on five separate occasions whether the check had cleared. He was told each time by Pitts that it had not. He had never dealt with Hill, who was a teller at the Mabank branch of the Bank, regarding this deposit. At the time of his inquiry, he did not explain the circumstances to Hill. A reasonable juror would rely on this contextual evidence to determine that expecting Hill to know the background of this transaction, and then relying on her statements, was not justifiable.

Payne asserted that she relied on what McDougald said after looking at her computer screen. McDougald handled the transaction for ADT when the check was brought to the Bank.

Therefore, she was aware of the fact that it was drawn on a foreign bank. She was also aware that ADT did not want to disburse the proceeds from the check until it had cleared. Considering this evidence in isolation, this evidence appears to be some evidence that ADT justifiably relied on McDougald's affirmative response to Payne's question about the status of the check. However, we must also consider the context. *See City of Keller*, 168 S.W.3d at 812. As explained above, McDougald's response was truthful, based on what she read on her computer screen. A deposit had been made and the funds were available for ADT's use. Additionally, there is even more compelling contextual evidence.

Our supreme court has stated that a person may not justifiably rely upon a representation if there are "red flags" indicating reliance is unwarranted. *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). Here, the communications with Lopez raised numerous red flags.

Lopez identified himself as a chief financial officer of a Chinese company. Yet, his numbers in his communications with ADT were never consistent. He said his "stock broker" was sending "a payment of $105,000.00USD ($500,000.00USD)." He had his "account manager," Mr. Green Sound, send a check for $35,000.00. The check that was sent showed a numerical amount of $35,000.00 while the amount shown in writing was only $30,000.00.

Lopez initially said he needed "$98,000.00 for the purchase of Chinese home style furniture, Chinese home style entertainment, Chinese home decorations, and Chinese kitchen appliances." But then, he asked that only $30,000.00 be wired for the purchase of these items.

The name of the Chinese chief financial officer, Yang Hua Lopez, was unusual. "Lopez" is not of Chinese origin. Lopez said the money would be sent by his "stockbroker in America." The check, however, was sent from Canada by a "Mr. Green Sound," who identified himself as an "account manager." Further, the counterfeit check was drawn on the Bank of Montreal by a Canadian insurance company with the name of "AXA."

Lopez first told ADT that he wanted a house located in its city. But, when sent a list of prospective properties, he chose a house eighty miles away. He made this choice only one and a half hours after he had been presented a list of the properties by ADT.

Lopez never signed a buyer's representation agreement with ADT although he was asked on numerous occasions to do so. Further, he never signed an earnest money contract for the property he had selected. Finally, Lopez requested that the funds, which had been paid by a

Canadian insurance company and drawn on a Canadian bank, be wired to a bank in Tokyo, Japan so that he could purchase furnishings in China for the Texas property.

ADT appeared to accept all of these implausible names, conflicting messages, inconsistent numbers, contradictory instructions, unusual circumstances, and absence of key documents at face value, rather than probing further into these red flags to determine if this was a legitimate transaction. A fraud plaintiff cannot recover if he blindly relies upon a misrepresentation, the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. *Field v. Mans*, 516 U.S. 59, 71, 116 S. Ct. 437, 444, 139 L. Ed. 2d 351 (1995). A reasonable juror would determine that these numerous red flags should not be disregarded. *See City of Keller*, 168 S.W.3d at 812.

Further, a reasonable juror would determine that the red flags show, if ADT relied on the Bank employees' statements as information concerning whether the check had cleared, that reliance was unjustified. Considering the context, we hold that the evidence that Payne justifiably relied on McDougald's statement is no more than a scintilla. *See Merriman*, 407 S.W.3d at 248. Accordingly, there is no evidence that ADT justifiably relied on the tellers' statements. *See Grant Thornton*, 314 S.W.3d at 923.

The record indicates there is no evidence of a material misrepresentation by the Bank, a knowing or reckless misrepresentation by the Bank, or justifiable reliance on the Bank's representation. Therefore, the trial court correctly granted a summary judgment in favor of the Bank on ADT's fraud claim. *See Merriman*, 407 S.W.3d at 248; *Exxon Corp.*, 348 S.W.3d at 217. We overrule ADT's sixth issue. We need not address ADT's third issue. TEX. R. APP. P. 47.1; *Merriman*, 407 S.W.3d at 248.

### ATTORNEY'S FEES

Finally, in its fourth issue, ADT challenges the trial court's award of attorney's fees to the Bank on its counterclaim. ADT contends that attorney's fees are not warranted because no actual damages were awarded to the Bank, the Bank presented no claims for affirmative relief, and the services of the Bank's attorneys were only defensive to ADT's claim.

The issue of whether a party is entitled to recover attorney's fees is a question of law for the court to determine. *Jackson Law Office, P.C. v. Chappell*, 37 S.W.3d 15, 23 (Tex. App.— Tyler 2000, pet. denied). A party may recover attorney's fees only as provided by contract or

statute.  ***Woodhaven Partners, LTD v. Shamoun & Norman, L.L.P.***, 422 S.W.3d 821, 837 (Tex. App.—Dallas 2014, no pet.).  Parties are free to contract for a fee recovery standard either more or less strict than Chapter 38 of the Civil Practice and Remedies Code.  ***Intercontinental Group P'ship v. K.B. Home Lone Star L.P.***, 295 S.W.3d 650, 653 (Tex. 2009).  When parties include an attorney's fee provision in a contract, the language of the contract controls over the language of the statute.  ***Peterson Group, Inc. v. PLTQ Lotus Group, L.P.***, 417 S.W.3d 46, 88 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (Keyes, J., dissenting).  Whether a party is a prevailing party is based on success on the merits, not the award or denial of damages.  ***Robbins v. Capozzi***, 100 S.W.3d 18, 27 (Tex. App.—Tyler 2002, no pet.).  A prevailing party is one who is vindicated by the trial court's judgment.  *Id*.

The deposit agreement between the Bank and ADT included the following clause:

> You also agree to pay all attorney's fees, costs and expenses that financial institution may incur as a result of any claim or action made against financial institution by you or on your behalf related to your account where financial institution is found not to be liable for such claim.

The Bank sought attorney's fees pursuant to this clause in the deposit agreement.  The parties' agreement specifically stated that the Bank would be entitled to its attorney's fees if it was found not to be liable on any claim made by ADT.  Although the Bank received no damages or affirmative relief, it was the prevailing party in this litigation due to the fact that it was found not to be liable on the claims made against it by ADT.  *Id*.  The trial court properly awarded the Bank its attorney's fees.  *See **Woodhaven Partners, LTD***, 422 S.W.3d at 837.  We overrule ADT's fourth issue.

### DISPOSITION

**W**e *affirm* the trial court's judgment.

JAMES T. WORTHEN
Chief Justice

Opinion delivered December 30, 2015.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

20



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**DECEMBER 30, 2015**

**NO. 12-14-00117-CV**

**AMERICAN DREAM TEAM, INC.,**
Appellant
V.
**CITIZENS STATE BANK,**
Appellee

Appeal from the 173rd District Court
of Henderson County, Texas (Tr.Ct.No. 2012A-0911)

        THIS CAUSE came to be heard on the oral arguments, appellate record, and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

        It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that all costs of this appeal are hereby adjudged against the appellant, **AMERICAN DREAM TEAM, INC.,** for which execution may issue, and that this decision be certified to the court below for observance.

        James T. Worthen, Chief Justice.
        *Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*