**Opinion issued March 18, 2021**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-19-00427-CV

_____

**RANDALL L. NEAL, Appellant**

**V.**

**DAVID CULLEN NEAL, Appellee**

---

**On Appeal from the Probate Court No. 1**
**Travis County, Texas**
**Trial Court Case No. C-1-PB-15-001898**

---

## MEMORANDUM OPINION

This is a will contest case. Appellant, Randall L. Neal, and appellee, David

Cullen Neal, are both children of the decedent, Florene Swensen Neal. After Florene

died in 2015, Randall applied for letters of dependent administration and a

determination of heirship, alleging that Florene died without a valid will. David offered a will dated January 23, 2012, for probate as a muniment of title. The probate court admitted the January 2012 will to probate as a muniment of title and denied Randall's application.

On appeal, Randall argues that the probate court erred in admitting the January 2012 will to probate because (1) the court's finding that Florene had testamentary capacity when she executed the will is contrary to the great weight of medical and testimonial evidence presented at trial, and (2) the court erroneously disregarded evidence of undue influence in execution of the will. We affirm.

## Background

### A. *The Decedent's Wills*

Florene Neal was married three times and had three adult sons: John Edwin Preece, Randall Neal, and David Neal. Her third husband, Archie Neal, died in July 2009. Florene did not remarry.

Florene executed several wills during her life. On June 14, 2008, while her husband was still alive, she executed a will naming her eldest son John as independent executor and devising her entire estate to her husband. If her husband did not survive her, she devised her estate to John, Randall, and her two stepchildren in equal shares. Florene expressly stated in this will that she was not including David in the division of her estate because, upon her death, he would get full ownership of

a piece of real property in Pflugerville, Texas (the Pflugerville property), which they owned as joint tenants with right of survivorship. One of the witnesses to the execution of this will was Melissa Ferringer, an attorney.

Florene executed a second will on November 9, 2009, after her husband passed away. This will also named John as independent executor. The second will contained twenty-one specific bequests to various family members, including Randall, David, Florene's sister, her niece, and her grandchildren. Florene devised the residuary of her estate to John, Randall, and David, in equal shares. Ferringer witnessed the execution of this will as well.

Florene executed a third will on April 13, 2011. This will, like the previous two wills, named John as independent executor. This will included the same twenty-one specific bequests as the second will, but divided the residuary estate between John and Randall in equal shares. The third will, like the first will, stated that David was not included in the division of the residuary estate because he would receive full ownership of the Pflugerville property upon Florene's death. Ferringer did not witness the execution of this will.

Finally, Florene executed a fourth will on January 23, 2012. This will named David as independent executor. On this same date, Florene executed a durable and a medical power of attorney that named David as her attorney-in-fact. The January 2012 will contained no specific bequests and devised all of Florene's estate to David.

The will also stated: "It is my express intent to disinherit my other two children, Randall (Randy) Neal and John Edwin Preece, as identified in Section I [identifying Florene's family], as beneficiaries to my estate." Ferringer prepared this will for Florene. It is the validity of this will that is at issue in this case.

Florene died on July 28, 2015, in Austin, Texas.[1] She was seventy-four years old.

## B.    *Initial Probate Proceedings*

In April 2016, Randall filed an "Application for Letters of Dependent Administration and a Determination of Heirship." In this filing, Randall alleged that Florene had no valid will at the time of her death and therefore died intestate. He alleged that any will purporting to be Florene's last will that might be offered for probate by his younger brother David was not valid because Florene lacked testamentary capacity at the time she executed the will. Randall alleged that each of Florene's three sons had a one-third interest in the property of her estate. Randall further alleged that a necessity existed for administration of the estate to dispose of the estate's liabilities and distribute its assets, which consisted of real and personal property valued over $50,000. Randall also alleged that an administration was

---

[1]    The Texas Supreme Court transferred this appeal from the Court of Appeals for the Third District of Texas to this Court pursuant to its docket-equalization authority. *See* TEX. GOV'T CODE ANN. § 73.001 ("The supreme court may order cases transferred from one court of appeals to another at any time that, in the opinion of the supreme court, there is good cause for the transfer.").

4

necessary because David had wrongfully converted property belonging to Florene and the estate.

In January 2017, David filed an application to probate Florene's January 2012 will as a muniment of title.[2] He alleged that the will named him as independent executor. He further alleged that, to the best of his knowledge, the estate did not have any debts and, therefore, an administration of the estate was not necessary.

Randall opposed admitting the January 2012 will to probate. He argued that Florene had been diagnosed with vascular dementia in August 2011—five months before execution of the will—and therefore lacked testamentary capacity at the time she executed the will. He also argued that David exerted undue influence to force Florene to execute the January 2012 will. According to Randall, Florene previously executed a will that "more evenly apportioned the Estate among her three children," but David assumed control over Florene after her dementia diagnosis and forced her to execute a will that left her entire estate to him. Randall further accused David of forcing Florene to grant him power of attorney, and then using that authority to keep Florene away from her other children.

---

[2] *See* TEX. EST. CODE ANN. § 257.001 (providing that court may admit will to probate as muniment of title if court is satisfied will should be admitted to probate and court (1) is satisfied that estate does not owe unpaid debts, other than debts secured by lien on real estate, or (2) finds for another reason that there is no necessity for administration of estate).

*C.* *Hearing Before the Probate Court*

The probate court began a hearing on David's application to probate the January 2012 will as a muniment of title on April 19, 2018. David testified on his own behalf. Randall, Lorraine Smith (Florene's twin sister), and Louise Preece (John's wife, and Florene's daughter-in-law) all testified in support of Randall's position.

Following conflicting testimony on where Florene had resided in late 2011 and early 2012, the probate court recessed the hearing so the parties could obtain records from the assisted living facility and nursing home that cared for Florene.[3] The probate court also recessed the hearing so the parties could obtain the presence of Ferringer, Florene's attorney who prepared the January 2012 will.

The probate court resumed the hearing nearly one year later, on March 26, 2019. At that resumed hearing, Ferringer testified that she believed that Florene was of sound mind when she executed the will and that Florene was not under the influence of anyone at the relevant time periods.

Over the course of the hearings, the probate court admitted several exhibits including Florene's current and prior wills, her banking records with shifting payable-on-death beneficiaries, and her medical records. Florene's medical records

---

[3] These records were admitted at the continuation of the hearing and reflected that Florene moved into Horizon Bay, an assisted living facility, in November 2012. There is no documentary evidence reflecting where Florene lived in January 2012.

included records from a stroke that occurred in July 2011, a diagnosis of vascular dementia that year, and her dementia care following that diagnosis.

On April 17, 2019, the probate court signed an order admitting Florene's January 2012 will to probate as a muniment of title. Among other recitations in the order, the probate court found that Florene "was of sound mind" on the date she executed the will. The probate court did not make a specific finding concerning undue influence. In a separate order signed the same day, the probate court denied Randall's application for letters of dependent administration and a determination of heirship. This appeal followed.

## Testamentary Capacity

In his first two issues, Randall argues that the probate court's finding that Florene had testamentary capacity when she executed the January 2012 will was contrary to the great weight and preponderance of medical and testimonial evidence presented at trial.

### A. Standard of Review

In an appeal from a bench trial, the trial court's findings of fact have the same weight as a jury's verdict. *HTS Servs., Inc. v. Hallwood Realty Partners, L.P.*, 190 S.W.3d 108, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.). We therefore review the trial court's findings for legal and factual sufficiency using the same standards that we use to review a jury verdict. *Tex. Outfitters Ltd. v. Nicholson*, 572

7

S.W.3d 647, 653 (Tex. 2019); *HTS Servs.*, 190 S.W.3d at 111. When there is a complete reporter's record, findings of fact are not conclusive, and they are binding only if supported by the evidence. *HTS Servs.*, 190 S.W.3d at 111.

When conducting a factual sufficiency review, we consider all the evidence in a neutral light. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam); *Woods v. Kenner*, 501 S.W.3d 185, 196 (Tex. App.—Houston [1st Dist.] 2016, no pet.). We will reverse only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem. Co.*, 46 S.W.3d at 242; *Woods*, 501 S.W.3d at 196.

In a bench trial, the trial court is the sole judge of the witnesses' credibility, and the court may choose to believe one witness over another. *Woods*, 501 S.W.3d at 196 (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003), and *Zenner v. Lone Star Striping & Paving, L.L.C.*, 371 S.W.3d 311, 314 (Tex. App.—Houston [1st Dist.] 2012, pet. denied)). The trial court may resolve any inconsistencies in a witness's testimony, but it is not free to believe testimony that is conclusively negated by undisputed facts. *Zenner*, 371 S.W.3d at 314 (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 820 (Tex. 2005)). We may not substitute our judgment for that of the trial court. *McKeehan v. Wilmington Sav. Fund Soc'y, FSB*, 554 S.W.3d 692, 698 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *Woods*, 501 S.W.3d at 196.

### B. Law Governing Testamentary Capacity

Before a court admits a will to probate, the proponent of the will must establish that the will was properly executed and that the testator had testamentary capacity at the time of execution. *In re Estate of Danford*, 550 S.W.3d 275, 281 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *In re Estate of Arrington*, 365 S.W.3d 463, 466 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (stating that to admit will to probate, trial court must find that it is valid, and proponent of will has burden to establish validity). The proponent of the will may make a prima facie case on these issues by introducing a self-proving will into evidence. *Estate of Danford*, 550 S.W.3d at 281; *see* TEX. EST. CODE ANN. § 251.101(1) (providing that self-proved will is will with attached or annexed self-proving affidavit subscribed and sworn to by testator and witnesses), § 251.104 (setting out requirements for self-proving affidavit); *Estate of Arrington*, 365 S.W.3d at 467 ("A self-proved will is prima facie evidence that the will was properly executed."). The burden of producing evidence that negates testamentary capacity shifts to the contestant of the will, although the burden of persuasion on the issue always remains with the will's proponent. *Estate of Danford*, 550 S.W.3d at 281; *In re Estate of Coleman*, 360 S.W.3d 606, 611 (Tex. App.—El Paso 2011, no pet.).

A testator has testamentary capacity when, at the time of the execution of the will, she possesses sufficient mental ability to (1) understand the business in which

9

she was engaged, the effect of making the will, and the general nature and extent of her property; (2) know her next of kin and the natural objects of her bounty; and (3) have sufficient memory to assimilate the elements of executing a will, to hold those elements long enough to perceive their obvious relation to each other, and to form a reasonable judgment as to them. *Estate of Danford*, 550 S.W.3d at 281; *Estate of Arrington*, 365 S.W.3d at 467–68; *Guthrie v. Suiter*, 934 S.W.2d 820, 829 (Tex. App.—Houston [1st Dist.] 1996, no writ).

The key to this inquiry is whether the testator had testamentary capacity on the day the will was executed. *Estate of Danford*, 550 S.W.3d at 281; *Estate of Arrington*, 365 S.W.3d at 468. This may be inferred from the testimony of lay and expert witnesses concerning their observations of the testator's conduct prior or subsequent to the execution of the will. *Estate of Danford*, 550 S.W.3d at 281 (quoting *In re Estate of O'Neil*, No. 04-11-00586-CV, 2012 WL 3776490, at *6 (Tex. App.—San Antonio Aug. 31, 2012, no pet.) (mem. op.)); *Horton v. Horton*, 965 S.W.2d 78, 85 (Tex. App.—Fort Worth 1998, no pet.) (stating that while "ultimate question" is whether testator had capacity on date will was executed, "the court may also look to the testator's state of mind at other times if these times tend to show his state of mind on the day the will was executed"). Evidence that the testator was incompetent at other times can be used to establish a lack of testamentary capacity on the day the will was executed if the evidence "demonstrates

10

that the condition persists and 'has some probability of being the same condition which obtained at the time of the will's making.'" *Croucher v. Croucher*, 660 S.W.2d 55, 57 (Tex. 1983) (quoting *Lee v. Lee*, 424 S.W.2d 609, 611 (Tex. 1968)); *Estate of Arrington*, 365 S.W.3d at 468; *Horton*, 965 S.W.2d at 85 ("Such evidence may be considered only if it demonstrates that a condition affecting the individual's testamentary capacity was persistent and likely present at the time the will was executed.").

*C.     Analysis*

Randall contends that the probate court's finding that Florene had testamentary capacity when she executed the January 2012 will was against the great weight and preponderance of both the testimonial and medical evidence presented to the court.

In support of his argument, Randall primarily points to Florene's medical records from 2011–2013. These records demonstrate that Florene had a stroke in July 2011, and she was subsequently diagnosed with cerebrovascular disease and dementia. The records, from both her primary care physician and a home healthcare agency, reflect that Florene had cognitive deficits, including hallucinations, confusion, and problems with her short-term memory. The records from July through September 2011 repeatedly note that Florene was forgetful and needed some assistance to remember recent events. For example, a record from August 9, 2011,

11

included a notation that Florene "incorrectly recalled plans with her family today for a relative[']s [birthday]" and she "forgot which son she was talking to on the phone the other day."

Throughout this time, Florene needed assistance in performing tasks such as dressing herself and preparing meals, and she was no longer allowed to drive. The records also reflect that Florene's condition improved throughout August and September 2011, that she practiced journaling and used calendar aids to help with her short-term memory problems, and that, by September 2011, she was no longer considered "homebound." A notation on a record from September 23, 2011, states, "vascular dementia stable at this time."

The medical records admitted into evidence run primarily from July 2011 through September 2011 and then from June 2012 through 2013, after Florene moved to an assisted living facility and then into memory care. The records from 2012 indicate that Florene's memory problems continued to worsen. She continued to have occasional hallucinations and altered mental status. A note from a doctor's visit on July 13, 2012, states that "Patient continues to have mild dementia although very functional at this time." However, at one point in September 2012, Florene told a nurse that she wanted to remove David from her HIPAA authorization and add Lorraine, but her doctor stated that "she is not lucid enough to remove her son from her [HIPAA] form at this time." Other records from this period of time reflect that

12

she was able to have meaningful conversations, recognize familiar faces, find her way home, and remember where she lived. In November 2012, Florene moved to the Horizon Bay assisted living facility, and she remained in assisted living facilities or nursing homes for the remainder of her life.

In addition to Florene's medical records, Randall, Lorraine, and Louise all testified that they did not believe Florene was of sound mind during 2011 and 2012, and they did not believe Florene could have appreciated the complexities of executing a testamentary document. These witnesses all testified that, by January 2012, Florene had been diagnosed with vascular dementia; she had had visual hallucinations; she had compromised vision; and she needed 24-hour care to assist her with daily activities such as feeding, dressing, and bathing herself.

Randall also testified that Florene's short-term memory deficits were serious enough that she forgot who visited her and what she had eaten the day before. Louise testified that, in August 2011, Louise's daughter had temporarily moved in with Florene to assist her, but her daughter was overwhelmed and could not provide the needed care.

Randall also testified that an incident occurred in September 2011, in which Florene, with Ferringer's assistance, "kicked [him] out of [her] house." He did not see her again until the second or third week of January 2012. He stated that Florene was living at the Pflugerville property at that time. While David was not living there,

13

David's son and his girlfriend were living there and were helping care for Florene. Randall spent about an hour and a half with Florene on this occasion. He did not provide any details about this visit or Florene's condition at the time. Randall testified that he next saw Florene in April 2012, also at the Pflugerville property, and then again in August 2012. He stated that he spoke with her over the phone "at least four or five times a week," and Florene knew who he was "[m]ost of the time."

Lorraine testified that in the latter half of 2011, she typically visited Florene once a week and would sometimes take her to doctor's appointments. Lorraine would spend two to three hours visiting Florene at Florene's house, and they would socialize or watch television. Florene knew where she was living, and Florene always knew who Lorraine was. Lorraine had no recollection of any instance in which Florene did not know who her children were. Lorraine could not recall when Florene moved to the assisted living facility, but she visited Florene there at least once and testified that Florene "had her own apartment."

David agreed that Florene had "early-onset dementia" and "had issues," including hallucinations. He did not agree that Florene's capacity was diminished, as she "still made her own decisions." He testified that Florene moved into an assisted living facility in November 2011, she had started taking a new medication at that time, and she was "actually much improved over where she had been." Florene no longer needed 24-hour care at this point, she was involved in choosing

14

which assisted living facility she wanted, and she lived by herself at the facility until she was moved into a memory care unit in late 2012.

David was asked to review portions of the medical records during his testimony. He explained that the period running from July through September 2011, immediately after Florene's stroke, "was about the worse she was." She later improved after moving to the assisted living facility in November 2011. Florene's medications changed and "she got active again." David testified that Florene improved to the point where she was able to take care of her daily activities, including administering her medications. Also, she remembered who and where she was. Although Florene made improvements after the stroke, she began to suffer more symptoms of dementia in the latter part of 2012, which led to her being placed in a memory care facility.

David believed that, in January 2012, Florene had sufficient mental ability to understand that she was making a will and to understand the effect of making a will. He also believed that Florene had sufficient mental ability to understand the general nature and extent of her property, to know who her children and next of kin were, and to gather that information and make a rational decision. He testified that Florene—not David—was the one who called Ferringer to draft a new will in January 2012. David also testified that he did not immediately offer the January 2012 will for probate after Florene died because Ferringer advised him that he did not

15

have to do so. David was also listed on Florene's bank account, he owned the entire Pflugerville property through right of survivorship, and other family members "got what they wanted" out of Florene's personal property when she went to the assisted living facility.

Ferringer provided the only direct evidence of Florene's condition at the time she executed the January 2012 will. Ferringer first met Florene in 2004 or 2005. She had also previously prepared wills for Florene and her husband before he passed away in 2009 and for Florene individually. Ferringer considered Florene to be a friend, and they would occasionally have lunch or dinner together. With respect to the January 2012 will, Ferringer testified that Florene "sought [her] out and gave [her] a call." Just as she had on previous occasions, Florene told Ferringer that she needed to make revisions to her will. When asked whether Florene discussed her reasons for wanting to change her will, Ferringer testified:

> She did. Because my—part of my practice when I would have a client was have a consultation, either initially to figure out what their needs are for their estate planning and also what they're doing. It's not my job to judge them, but it's my job to find out what they're doing and why. So she—since I had done previous [wills] for her, this particular last one she asked me to do because a lot of the specific bequests that she had in there were already given to people or quite frankly she told me things have just disappeared, so those are no longer valid.

> But the main reason she contacted me to draft a new will was because she had some concerns that money was disappearing from her account. She had another episode with her son [Randall] that upset her. And that in particular—I don't know the details, but I remember that she was upset because she was at her house and he wanted to have her arrested.

16

I don't know anymore than that. She was upset about it and said enough is enough, she needs to make some changes so I made the changes.

Ferringer stated that Florene also wanted to change her power of attorney from her son John to David, and Ferringer prepared those documents for Florene as well. She executed a new power of attorney on the same date that she executed the January 2012 will.

Ferringer believed that Florene had testamentary capacity to execute the January 2012 will, as Ferringer would not have drafted the will for her otherwise. Ferringer believed that Florene had the mental ability to understand the effect of drafting the will. She stated that she and Florene spoke "at length" about whether Florene was allowed to disinherit her children. Ferringer told Florene that this was permissible and asked Florene why she would want to disinherit her sons. Florene then shared her concerns. Ferringer testified that if a person lacked sufficient mental capacity, "they wouldn't have noticed things going on that [Florene] noticed." Ferringer stated that Florene's changes to her will "did not seem out of the ordinary for her situation." She testified that there was no question that Florene knew the extent of her property and who her children were. She stated that Florene articulated specific reasons why she wanted to change her will, those reasons were rational, and they were consistent with things Florene had said to Ferringer during previous conversations.

On cross-examination, Ferringer stated that, at the time she drafted the January 2012 will, she was not aware that Florene had dementia or had been hospitalized for having dementia-related symptoms. She testified, however, that at the time of the January 2012 will, Florene did not exhibit any signs or symptoms indicating that she was not oriented to time and place.

Ferringer later visited Florene in a nursing home towards the end of Florene's life. At that time—which was "way after" the January 2012 will—Florene was not oriented to time and place. Ferringer agreed that she visited Florene in an assisted living facility prior to January 2012. She believed that Florene was in assisted living because her "house was too much for her to maintain." She was not aware that Florene's being in assisted living had anything to do with her mental state. She agreed that it would be a "red flag" if someone wanted her to prepare a will and that person had undergone treatment for a mental illness or had been disoriented and was under a doctor's care.

The probate court thus was confronted with conflicting evidence concerning Florene's level of functioning and mental abilities at the time she executed the January 2012 will. Medical records from several months before the will reflect that Florene had a stroke and had been diagnosed with cerebrovascular disease and dementia. As a result, she had some cognitive deficits and problems with her short-term memory and with occasional hallucinations. Medical records from several

18

months after the will reflect that these symptoms continued to worsen. There is no dispute that, by the end of 2012, Florene could no longer live on her own, and she eventually moved into a memory care unit. The medical records, although probative of Florene's capacity at the time she executed the will, are not conclusive. The records themselves indicate that while Florene had dementia, a progressive condition, it was "stable" and she was "very functional" well into 2012. The records also reflect that while Florene experienced cognitive deficits and memory problems in the immediate aftermath of the July 2011 stroke, and some short-term memory difficulties persisted, her condition was improving as of September 2011.

The testimonial evidence before the probate court was also conflicting. While Randall, Lorraine, and Louise all testified that they did not believe Florene was of sound mind or had the capacity to execute a will in January 2012, David and Ferringer testified to the contrary. Ferringer, a witness not interested in Florene's estate, provided direct evidence concerning Florene's behavior at the time she executed the January 2012 will. Florene approached Ferringer about revising her will, and she and Ferringer spoke "at length" about why Florene wanted to make the changes and expressly disinherit Randall and John. Although Ferringer was unaware of Florene's dementia diagnosis, she testified that Florene did not exhibit any signs or symptoms of being disoriented. Florene was able to explain why she wanted the

19

changes to her will, and these changes appeared to Ferringer to be rational in light of the circumstances that Florene described.

When considering all of the evidence in a neutral light, we cannot conclude that the probate court's finding that Florene had testamentary capacity on the date she executed the January 2012 will was against the great weight and preponderance of the evidence. *See In re Estate of Hemsley*, 460 S.W.3d 629, 637–38 (Tex. App.—El Paso 2014, pet. denied) (holding that legally and factually sufficient evidence supported trial court's finding that testator had testamentary capacity in part because court heard direct evidence of testator's mental condition on date he executed will and witnesses who were present testified that testator knew he was executing his will and indicated he had deliberately chosen particular disposition of his property); *Estate of Arrington*, 365 S.W.3d at 468 (considering direct evidence of testator's mental condition on date will was executed from subscribing witnesses, one of whom who had known testator for twenty years and stated that nothing about testator's behavior was out of ordinary); *Horton*, 965 S.W.2d at 86 (concluding there was no evidence testator lacked testamentary capacity even though testator had been diagnosed with brain cancer, took medications to control pain, and had experienced hallucinations and disorientation at times when five witnesses testified that, on date will was executed, testator was fully alert and in control of mental capacities).

We overrule Randall's first and second issues.

20

## Undue Influence

In his third issue, Randall argues that the probate court erred in disregarding evidence that David used undue influence to procure execution of the January 2012 will.

### A.    *Law Governing Undue Influence*

Undue influence in the procurement of a will is a ground for contesting a will that is separate and distinct from lack of testamentary capacity. *Estate of Danford*, 550 S.W.3d at 281. "[W]hile testamentary incapacity implies the want of intelligent mental power, undue influence implies the existence of a testamentary capacity subjected to and controlled by a dominant influence or power." *Id.* (quoting *Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963)). The party contesting the execution of a will generally bears the burden of proving undue influence. *Id.* "The contestant must prove the existence and exertion of an influence that subverted or overpowered the testator's mind at the time she executed the testament such that the testator executed a will that she otherwise would not have executed but for such influence." *Id.*; *see In re Estate of Scott*, 601 S.W.3d 77, 89 (Tex. App.—El Paso 2020, no pet.).

Not every influence exerted by a person onto the will of another is undue. *In re Estate of Johnson*, 340 S.W.3d 769, 776 (Tex. App.—San Antonio 2011, pet. denied). An influence is not considered undue "unless the free agency of the testator

is destroyed and a testament is produced that expresses the will of the one exerting the influence rather than the will of the testator." *Horton*, 965 S.W.2d at 87; *see Estate of Scott*, 601 S.W.3d at 89 (stating that undue influence is influence or dominion exercised at time of execution of will that destroys free agency of testator and substitutes desires of another). The will contestant must therefore present competent evidence that an undue influence existed and evidence of the testator's state of mind at the time the will was executed "that would tend to show [her] free agency was overcome by such influence." *Horton*, 965 S.W.2d at 87.

In determining whether undue influence has been established we consider several factors, including

> whether the accused party had an opportunity to exercise the type of influence or deception that is alleged, the circumstances surrounding the drafting and execution of the will, and the existence of a fraudulent motive. The court should also consider whether the will makes an unnatural disposition of property, considering the nature and type of relationship existing between the testator, the contestants, and the party accused of exerting such influence. Other relevant factors are whether the testator has been habitually subjected to the control of the accused party, whether the testator was mentally or physically capable of resisting the accused party, the words and acts of the testator, and the weakness of the testator's mind and body. As with a challenge to testamentary capacity, the circumstances relied on to establish undue influence must be of a reasonably satisfactory and convincing character, and must not be equally consistent with the absence of such influence. "This is so because a solemn testament executed under the formalities required by law by one mentally capable of executing it should not be set aside upon a bare suspicion of wrongdoing."

*Id.* (quoting *Rothermel*, 369 S.W.2d at 922–23).

22

Courts cannot infer the exertion of undue influence based on opportunity alone. *Id.* (quoting *Rothermel*, 369 S.W.2d at 923); *see Estate of Scott*, 601 S.W.3d at 90 ("[T]he fact that an individual had the opportunity to influence the testator, such as by being the testator's caregiver, is insufficient to establish undue influence."); *Guthrie*, 934 S.W.2d at 832 ("Mere opportunity to unduly influence a testatrix is no proof that influence has actually been exerted.").

Undue influence may take the form of force, intimidation, duress, excessive importunity or deception to overcome the will of the testator. *Estate of Scott*, 601 S.W.3d at 89 (quoting *Rothermel*, 369 S.W.2d at 922); *Guthrie*, 934 S.W.2d at 831 ("One may request, importune, or entreat another to create a favorable dispositive instrument, but unless the importunities or entreaties are shown to be so excessive as to subvert the will of the maker, they will not taint the validity of the instrument."). Undue influence can be established by direct or circumstantial evidence. *Estate of Scott*, 601 S.W.3d at 89. However, the evidence must be probative of the issue "and not merely create a surmise or suspicion that such influence existed at the time the will was executed." *Guthrie*, 934 S.W.2d at 831. Because undue influence may be part of a "continuing scheme," the factfinder may consider events occurring both before and after the execution of the will. *Estate of Scott*, 601 S.W.3d at 90.

A will contestant may raise a presumption of undue influence by introducing evidence that a fiduciary relationship existed between the testator and the will

23

proponent. *Estate of Danford*, 550 S.W.3d at 281. If the contestant's challenge to the will is based on a purported confidential or fiduciary relationship between the testator and the will proponent, the contestant bears the burden to establish such a relationship. *Id.* at 282; *Estate of Coleman*, 360 S.W.3d at 611. "A power of attorney creates an agency relationship, which is a fiduciary relationship as a matter of law." *Estate of Danford*, 550 S.W.3d at 286 (quoting *Miller v. Lucas*, No. 02-13-00298-CV, 2015 WL 2437887, at *4 (Tex. App.—Fort Worth May 21, 2015, pet. denied) (mem. op.)).

Once the contestant presents evidence of a fiduciary relationship, a presumption of undue influence arises and the will proponent bears the burden to produce evidence showing an absence of undue influence. *Id.* at 282. This presumption is rebuttable and shifts only the burden of production; it does not shift the ultimate burden of proof. *In re Estate of Grogan*, 595 S.W.3d 807, 818 (Tex. App.—Texarkana 2020, no pet.). Once evidence contradicting the presumption has been introduced, the presumption is extinguished, and the case proceeds as if no presumption ever existed. *Id.*

## B. Analysis

Randall argues that David held Florene's power of attorney and was therefore in a fiduciary relationship with her. According to Randall, a presumption of undue influence arose, but the probate court erroneously failed to hold David to the burden

24

of presenting evidence to show an absence of undue influence. David argues that he did not have the burden to disprove undue influence because Florene executed the document giving David power of attorney on the same day that she executed the January 2012 will and therefore no fiduciary relationship existed between David and Florene at the time the will was executed.

Randall cites the Fourteenth Court of Appeals' decision in *Estate of Danford* for the proposition that executing a durable power of attorney on the same day as a will is evidence that a fiduciary relationship existed at the time the testator executed the will. *See* 550 S.W.3d at 285–86. *Estate of Danford* involved an appeal from a summary judgment order. *See id.* at 280. On appeal, the will proponent argued that the contestants had failed to establish that the proponent was a fiduciary at the time the testator executed the will because the record did not demonstrate whether the testator signed the power of attorney before or after the will. *Id.* at 286 n.7.

The Fourteenth Court noted that because the case was a summary judgment, the contestants, as the nonmovants, only needed to point out evidence that raised a fact issue. *Id.* The court also noted that, in an appeal from a summary judgment order, all "evidentiary doubts" are resolved in the nonmovants' favor. *Id.* By presenting evidence that the testator signed the power of attorney on the same day that she signed the will, "sufficient evidence exists to allow a factfinder to reasonably

25

infer that [the testator] signed the power of attorney in such temporal proximity to the 2010 Will that a fiduciary relationship existed at the relevant time." *Id.*

Unlike *Estate of Danford*, this case is not an appeal from a summary judgment proceeding. However, assuming without deciding that the fact that Florene signed the power of attorney on the same day she executed the January 2012 will established a fiduciary relationship between Florene and David, thus raising a presumption of undue influence, we conclude that David presented evidence rebutting the presumption and showing a lack of undue influence. *See Estate of Grogan*, 595 S.W.3d at 818 (stating that presumption of undue influence that arises when contestant presents evidence of fiduciary relationship is rebuttable presumption); *Estate of Danford*, 550 S.W.3d at 282 (stating that once contestant presents evidence of fiduciary relationship, presumption of undue influence arises, and proponent bears burden to produce evidence showing absence of undue influence).

Specifically, David presented both his testimony and Ferringer's testimony that Florene was the one who contacted Ferringer about revising her will in January 2012. Ferringer testified that Florene called her and discussed the changes that she wanted made to her will. She also testified that Florene told her that she did not "want any of her family to be involved with her decisions on what she was doing with her estate." The record contains no evidence that David requested that Florene

26

change her will, or that he was otherwise involved in the drafting and preparation of the January 2012 will.

Ferringer's testimony is evidence rebutting any presumption of undue influence. This evidence therefore extinguishes the presumption of undue influence arising out of any fiduciary relationship existing between Florene and David. *See Estate of Grogan*, 595 S.W.3d at 818. We conclude that Randall, as the will contestant, retained the ultimate burden of proof to demonstrate undue influence. *See id.* (noting that presumption of undue influence arising from existence of fiduciary relationship is rebuttable, presumption is extinguished once evidence contradicting presumption is offered, and presumption shifts only burden of production and not ultimate burden of proof); *Estate of Danford*, 550 S.W.3d at 281 (stating that, generally, will contestant bears burden of proving undue influence).

Randall further argues that the probate court, in admitting the January 2012 will to probate, disregarded evidence of undue influence. He points out that the January 2012 will, which left Florene's estate in its entirety to David, was contrary to every other will Florene had executed in the past that provided for all three of her sons. He argues that the disposition of the estate in the January 2012 will is unnatural, pointing to Lorraine's testimony that Florene would not have disinherited Randall and John in favor of David alone absent undue influence on David's part. He further

27

argues that the will was executed "after [Florene] came exclusively under [David's] control" and during a time in which Florene was unable to care for herself.

The record before the probate court contained conflicting evidence concerning Florene's living arrangements at the time she executed the January 2012 will. David testified that she moved to Horizon Bay, an assisted living facility, in November 2011. Documentary evidence reflected that Florene moved to Horizon Bay in November 2012. Ferringer testified that she visited Florene in an assisted living facility before execution of the January 2012 will. She also testified that, on the date Florene executed the will, she picked Florene up at Florene's request, and drove her to the office where Florene executed the will. Ferringer did not state whether she picked Florene up from the assisted living facility or the Pflugerville property.

Lorraine testified that she visited Florene at the Pflugerville property during the latter half of 2011, and she also visited Florene at least once in an assisted living facility, but Lorraine did not know when she made that move.[4] Randall testified that Florene was living at the Pflugerville property in January 2012 with David's son and his girlfriend, but not David, and that he continued to visit her at this house occasionally in 2012. Although the record contains evidence that David assumed

---

[4]     Randall and Lorraine testified that they eventually lost track of Florene's whereabouts because David moved her from facility to facility and did not inform them of where Florene was. Neither Randall nor Lorraine provided a time frame for when this occurred.

28

primary responsibilities for Florene's care in late 2011, there is no evidence that Florene was living with David at the time she executed the January 2012 will.

There is also conflicting evidence in the record concerning the level of care that Florene required at this time. Randall presented evidence that due to her physical limitations and the cognitive deficits as a result of the stroke and the dementia diagnosis, Florene required 24-hour care and needed assistance to perform daily tasks such as feeding, dressing, and bathing herself. David disagreed that Florene required such care, testifying that, by November 2011, four months after her stroke, her condition had improved and she was more active. Florene did not go straight into a nursing home, but instead moved into an assisted living facility, where she had her own apartment and where she was mostly able to care for herself. It is undisputed that Florene had medical problems and needed at least some assistance.

Although this evidence is relevant to whether Florene had the physical or mental ability to resist influence upon her, this evidence does not establish that her will was subverted or overpowered at the time she executed the January 2012 will. *See Cotten v. Cotten*, 169 S.W.3d 824, 827 (Tex. App.—Dallas 2005, pet. denied) (stating that evidence of "age and the common maladies of age may be considered as establishing the testator's physical incapacity to resist or the susceptibility of her mind to an influence exerted," but noting that exertion of undue influence "cannot be inferred by opportunity alone" and evidence must exist that influence was present

29

and "exerted with respect to the making of the testament itself"); *see also Rothermel*, 369 S.W.2d at 923 (stating that "weakness of mind and body, whether produced by infirmities of age or by disease or otherwise" is material to whether testator's will was subverted or overpowered); *Estate of Grogan*, 595 S.W.3d at 819 ("[E]vidence showing that [the testator] was old and suffered the common maladies of age demonstrates only opportunity to exert influence, not the actual influence of his mind by [the will proponent] at the time he executed the 2010 will."); *Guthrie*, 934 S.W.2d at 832 ("A testatrix's weakened physical and mental condition is only indicative of her susceptibility to influence; it is no evidence that such influence exists in fact.").

Randall argues that the January 2012 will contained a disposition of Florene's estate—leaving her entire estate to David and expressly disinheriting Randall and John—that was unnatural, which is indicative of undue influence. He points out that all of Florene's prior wills had included provisions for all of her children, several of her wills had included numerous specific bequests to various family members, and two of her wills specifically did not include David as a residuary beneficiary because he would obtain full ownership of the Pflugerville property through right of survivorship upon Florene's death. Lorraine also testified that, absent undue influence, Florene would not have disinherited John and Randall in favor of David. *See Rothermel*, 369 S.W.2d at 923 (considering whether testament contains unnatural disposition of property).

30

Ferringer, however, testified that she had a conversation with Florene concerning why she wanted the specific changes made in the January 2012 will and Florene explained her reasoning. Florene told Ferringer that the majority of the specific bequests were no longer necessary because those items had already been given to the intended beneficiaries or those items had disappeared. Florene also told Ferringer that she had concerns that money was disappearing from her bank account and that she had had an episode with Randall during which he had apparently wanted to have her arrested. Ferringer testified that Florene's requests were rational and were consistent with things Florene had told her in past conversations.

The fact that Florene chose to exclude two of her children from the January 2012 will while providing for her other child "is not in and of itself evidence of undue influence." *See In re Estate of Kam*, 484 S.W.3d 642, 653 (Tex. App.—El Paso 2016, pet. denied) (quoting *In re Estate of Sidransky*, 420 S.W.3d 90, 99 (Tex. App.—El Paso 2012, pet. denied)); *see also Rothermel*, 369 S.W.2d at 923–24 (noting that situation in which testator prefers one close relative over another "is frequently present in cases involving the issue of undue influence, and it is only where all reasonable explanation in affection for the devise is lacking that the trier of facts may take this circumstance as a badge of disorder or lapsed mentality or of its subjugation"). A testator who is of sound mind "has the right to dispose of his or her property in the manner he or she wishes." *Estate of Kam*, 484 S.W.3d at 653

(quoting *In re Estate of Sidransky*, 420 S.W.3d at 99). Moreover, "[t]his principle holds regardless of whether a testator of sound mind's perceptions about the disinherited heir's actions or motivations at the time the testator signs the disinheriting instrument are true or not." *Id.*

At most, Randall presented evidence that due to Florene's mental and physical condition, David, as the person primarily responsible for Florene's care, had the opportunity to exercise undue influence over Florene. Mere opportunity to exercise undue influence is not enough; there must be evidence that that influence was actually exerted upon the testator with respect to the testamentary document in question. *See Rothermel*, 369 S.W.2d at 923; *Estate of Scott*, 601 S.W.3d at 90 ("[T]he fact that an individual had the opportunity to influence the testator, such as by being the testator's caregiver, is insufficient to establish undue influence."); *Estate of Grogan*, 595 S.W.3d at 819 (stating that evidence that will proponent cared for testator, lived with him, took his messages, and handled financial matters at his direction "is no evidence of the existence and exertion of undue influence because such contacts are 'equally consistent with the theory of innocence as . . . with the theory of wrongdoing'") (quoting *In re Estate of Fisher*, No. 06-14-00029-CV, 2014 WL 5465869, at *7 (Tex. App.—Texarkana Oct. 29, 2014, no pet.) (mem. op.)); *Guthrie*, 934 S.W.2d at 832 ("Mere opportunity to unduly influence a testatrix is no proof that influence has actually been exerted.").

The record contains no evidence—beyond speculation on the part of Randall, Lorraine, and Louise—that David actually exercised undue influence over Florene in order to procure execution of the January 2012 will. *See Guthrie*, 934 S.W.2d at 831 (stating that it is not sufficient for evidence to "merely create a surmise or suspicion that such [undue] influence existed at the time the will was executed"). There is no evidence in the record that David ever requested that Florene change her will from the April 2011 will—which included specific bequests for David but did not leave any portion of the residuary estate to him due to his obtaining full ownership of the Pflugerville property—to the January 2012 will, which left the entirety of Florene's estate to David. *See Estate of Scott*, 601 S.W.3d at 90 ("Mere requests or efforts to execute a favorable instrument are not sufficient to establish undue influence unless the requests or efforts are so excessive so as to subvert the will of the maker.") (quoting *Estate of Kam*, 484 S.W.3d at 652); *Guthrie*, 934 S.W.2d at 831 ("One may request, importune, or entreat another to create a favorable dispositive instrument, but unless the importunities or entreaties are shown to be so excessive as to subvert the will of the maker, they will not taint the validity of the instrument.").

Furthermore, there is no evidence that David played any role in Florene's decision to change her will or in preparation of the January 2012 will. *See Rothermel*, 369 S.W.2d at 923 (considering circumstances surrounding drafting and execution

33

of testament). As stated above, both David and Ferringer testified that Florene was the one who contacted Ferringer about changing her will. David was not present at the time or at the time of the new will's execution.

Considering all the evidence in a neutral light, we conclude that the probate court's implied finding that no undue influence occurred in connection with execution of the January 2012 will was not against the great weight and preponderance of the evidence. *See, e.g., Estate of Grogan*, 595 S.W.3d at 821 (concluding that evidence "produced merely a conjured suspicion of undue influence" and was not enough to create fact issue to defeat summary judgment); *Guthrie*, 934 S.W.2d at 832 (concluding that circumstantial evidence relied on by will contestant "does no more than surmise that the executor unduly influenced the testator and does not raise a question of fact on the issue").

We overrule Randall's third issue.

## Conclusion

We affirm the order of the probate court admitting Florene's January 2012 will to probate as a muniment of title.

April L. Farris
Justice

Panel consists of Justices Hightower, Countiss, and Farris.